UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Minnesota Voters Alliance et al., | Case No. 19-cv-0358 (WMW/HB) |
| Plaintiffs, | |
| v. | **ORDER** |
| The City of Saint Paul and the City of Minneapolis, | |
| Defendants. | |

This matter is before the Court on the parties' cross-motions for summary judgment. (Dkts. 11, 27.) Plaintiffs challenge the constitutionality of ordinances enacted by Defendants City of Saint Paul and City of Minneapolis that require landlords to provide voter-registration information to new tenants. For the reasons addressed below, the Court grants Plaintiffs' motion, denies Defendants' motion, declares the challenged ordinances facially unconstitutional as a matter of law, and permanently enjoins Defendants from enforcing the ordinances.

## BACKGROUND

In 2018, Saint Paul enacted an ordinance that requires landlords in the city to provide their new tenants voter-registration information. The ordinance provides as follows:

> *Obligation to inform.* An owner of a residential property that lets for occupancy any dwelling unit or rooming unit for a period of more than thirty (30) days, at the time of lease signing (or at the time of first occupancy if there is no formal lease), provide [sic] information to all tenant(s) who are eighteen (18)

> years of age or older of the tenant(s)' [sic] right to register to vote in the state of Minnesota and provide information on how to register to vote. An owner shall satisfy this requirement by providing voter registration information identified by the city clerk.

Saint Paul, Minn., Code of Ordinances ch. 48, § 48.02. Failure to comply with this requirement is a petty misdemeanor. *Id.* § 48.03. Saint Paul enacted Section 48.02 to address low voter registration and voter turnout among renters, young people, and people of color. Saint Paul City Council emails reflect that, when enacting its ordinance, Saint Paul relied on statistical data[1] demonstrating that, while 74 percent of homeowners in the United States register to vote, only 68 percent of renters register to vote. And 67 percent of homeowners vote, whereas only 51 percent of renters vote. Several landlords opposed Saint Paul's ordinance when it was introduced.

Minneapolis enacted a similar ordinance in 2016. The Minneapolis ordinance provides as follows:

> Beginning March 1, 2016, and continuing thereafter, the owner of any dwelling which is required to be licensed by this chapter shall provide information about how a voter may register in the State of Minnesota, in a manner approved by the city, to all tenants aged eighteen (18) or older at the time of first occupancy.

Minneapolis, Minn., Code of Ordinances § 244.2000(f). Failure to comply with this requirement may result in the loss of the landlord's rental license.[2] To comply with either

---

[1] The source of this statistical data does not appear to be in the record.

[2] Plaintiffs cite Section 244.1990, titled "[r]emedies in this article not exclusive," and assert that failure to comply with the requirement of Section 244.2000(f) "leads to criminal prosecution." But Plaintiffs' proposition is not supported by the text of Section 244.1990,

2

ordinance, a landlord must distribute a flyer that is designed and provided to the landlord by the clerk of the city in which the landlord's property is located. Defendants' flyers contain information about how and where the new tenants can register to vote.

Plaintiffs are several landlords[3] in Minneapolis and Saint Paul along with the Minnesota Voters Alliance, a Minnesota nonprofit organization whose membership comprises other landlords in Minneapolis and Saint Paul. Plaintiffs describe the primary purpose of Minnesota Voters Alliance as "educating and empowering the electorate, with interests inclusive of the integrity of the election process and of the rights of individuals related to the election process." Plaintiffs oppose the ordinances and their underlying policy. But because they fear criminal prosecution, the landlord-plaintiffs comply with the ordinances by distributing the flyers that are provided by the city in which the rental property is located.

Plaintiffs' lawsuit challenges the constitutionality of Defendants' respective ordinances. Plaintiffs allege that the ordinances compel landlords to speak, which violates their speech rights protected by the First Amendment to the United States Constitution.

---

which states that the remedies provided in this article "are in addition to, and do not supersede or preempt, other remedies such as condemnation, written violation orders and warnings, [and] criminal charges for violation of substantive provisions of any city or state code" that pertain to "housing maintenance, fire safety, building codes, zoning, health, and the like." Minneapolis, Minn., Code of Ordinances ch. 244, art. XVI, § 244.1990. In any event, Plaintiffs appear to have abandoned this proposition, as they asserted at oral argument that the remedy for failure to comply with Section 244.2000 is "possible loss of rental license."

[3] These plaintiffs include G & J Real Estate and Well Maintained Apartments in Saint Paul and Garfield Court Partnership, LLP, Marissa Skaja, and Charles Halverson in Minneapolis.

Plaintiffs seek a judicial declaration that the ordinances are unconstitutional, both facially and as applied; permanent injunctive relief against the enforcement of the ordinances; damages; and reasonable attorneys' fees and costs. On August 2, 2019, Plaintiffs filed the pending motion for summary judgment. Defendants oppose Plaintiffs' motion and cross-move for summary judgment.[4]

**ANALYSIS**

Summary judgment is proper when the record before the district court establishes that there is "no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When determining the merit of a motion for summary judgment, a district court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor. *See Windstream Corp. v. Da Gragnano*, 757 F.3d 798, 802–03 (8th Cir. 2014). When asserting that a fact is genuinely disputed, the

---

[4] Although Defendants did not file a formal motion for summary judgment as required by the Local Rules, *see* LR 7.1(c)(1), Defendants followed the magistrate judge's March 11, 2019 order setting a schedule and procedure for the parties to file cross-motions for summary judgment, which had been stipulated to by the parties. Moreover, Plaintiffs received sufficient notice of Defendants' informal motion as well as an opportunity to respond, which Plaintiffs have taken. For these reasons, Defendants' cross-motion for summary judgment is properly before the Court. *See, e.g.*, *Pancakes, Biscuits & More, LLC v. Pendleton Cty. Comm'n*, 996 F. Supp. 2d 438, 450 (N.D.W.Va. 2014) (granting summary judgment in favor of defendant, who "has made no formal motion for summary judgment in its favor, [but] does state in its Response that 'summary judgment should be granted on behalf of the Defendant' "); *Preston v. Leake*, 743 F. Supp. 2d 501, 506 n.2 (E.D.N.C. 2010) (same).

4

nonmoving party must "submit affidavits, depositions, answers to interrogatories, or admissions on file and designate specific facts" in support of that assertion. *Gander Mountain Co. v. Cabela's, Inc.*, 540 F.3d 827, 831–32 (8th Cir. 2008); *see also* Fed. R. Civ. P. 56(c)(1)(A).

Plaintiffs' complaint alleges that the ordinances enacted by Saint Paul and Minneapolis violate the Free Speech Clause of the First Amendment. The First Amendment, which applies to state and local governments by virtue of the Fourteenth Amendment, provides that the government "shall make no law . . . abridging the freedom of speech.'" U.S. Const. amend. I; *accord Telescope Media Grp. v. Lucero*, 936 F.3d 740, 750 (8th Cir. 2019). This First Amendment protection "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). State actors may not compel a person to utter a message with which the person does not agree. *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557 (2005). This protection is implicated when a person "must personally speak the government's message," as well as when a person is "forced to accommodate" a message that interferes with the ability of the speaker to communicate the speaker's own message. *Rumsfeld v. Forum for Academic & Institutional Rights, Inc. (F.A.I.R.)*, 547 U.S. 47, 63 (2006). When a state actor compels speech, that action is subject to strict scrutiny judicial review, which requires the state actor to prove that the action is "narrowly tailored" to serve a "compelling state interest." *Telescope Media*, 936 F.3d at 754 (quoting *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015)).

Plaintiffs contend that Defendants' ordinances are facially unconstitutional. To prevail on a typical facial challenge, the party challenging the government's action must "establish that no set of circumstances exists under which [the law] would be valid, or that the [law] lacks any plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472 (2010) (internal quotation marks and citation omitted); *accord Minn. Majority v. Mansky*, 708 F.3d 1051, 1056 (8th Cir. 2013). In the First Amendment context, a law also may be invalidated on a facial challenge as overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the [law's] plainly legitimate sweep." *Minn. Majority*, 708 F.3d at 1056 (quoting *Stevens*, 559 U.S. at 473).

## I. Applicable Standard of Review

As a threshold matter, the parties disagree as to the applicable standard of review for Plaintiffs' First Amendment claims. Plaintiffs contend that their challenge pertains to compelled speech, which requires strict-scrutiny review. Defendants counter that the claims pertain to government speech that is immune from a First Amendment freedom-of-speech challenge. In the alternative, Defendants argue that intermediate scrutiny applies.

"When the government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2245 (2015) (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 467–68 (2009)). In some situations, "it is difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech." *Summum*, 555 U.S. at 470. When a message is dictated or sufficiently controlled by the government, the message may be government speech even if private entities are involved in its creation.

*Id.* at 472–73 (concluding that city monuments were government speech even though many were designed, built, and donated by private entities because the city "effectively controlled the messages sent by the monuments . . . by exercising final approval authority over their selection" (internal quotation marks omitted)); *Johanns*, 544 U.S. at 562 (concluding that message was government speech when "the government set[ ] the overall message to be communicated and approve[d] every word that [was] disseminated").

Under the challenged ordinances in this case, landlords are required to provide their tenants with voter-registration flyers prepared by the city in which the rental property is located. There is no dispute that each city retains complete control over the content of its respective flyers. The flyers are pre-printed on city letterhead, bear the city logo, and provide contact information for the city government. Plaintiffs do not allege that they or any other private parties are involved in determining the content of the flyers. Because each city "sets the overall message to be communicated and approves every word that is disseminated" in its voter-registration flyers, the flyers clearly are government speech rather than private speech. *See Johanns*, 544 U.S. at 562. But this conclusion does not end the analysis.

According to Defendants, "when speech is deemed to be government speech, all First Amendment analysis, including whether or not the speech is compelled, is eliminated." Defendants misstate the law. In *Walker*, the Supreme Court of the United States observed that, although "the government can speak for itself, . . . [t]hat is not to say that a government's ability to express itself is without restriction." 135 S. Ct. at 2246 (internal quotation marks and citation omitted). The First Amendment "may constrain the

government's speech if, for example, *the government seeks to compel private persons to convey the government's speech*." *Id.* (emphasis added). Federal courts applying this aspect of *Walker* have concluded that "the issue of whether a [message] is government speech is inapposite" when "the central question presented is whether an individual has been compelled to speak." *Cressman v. Thompson*, 798 F.3d 938, 949 (10th Cir. 2015); *accord Masonry Bldg. Owners of Ore. v. Wheeler*, 394 F. Supp. 3d 1279, 1295 (D. Ore. 2019); *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310, 1325–26 (M.D. Ala. 2019); *PSEG Long Island LLC v. Town of N. Hempstead*, 158 F. Supp. 3d 149, 166 (E.D.N.Y. 2016).[5] This Court agrees.

When "the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." *Wooley*, 430 U.S. at 717. As such, "the government-speech and compelled-speech doctrines are concerned with different things: the former focuses on the government's interest in expressing its own views, while the latter involves the government putting particular messages in the mouths of private speakers." *Cressman*, 798 F.3d at 950 (internal quotation marks omitted). Contrary to Defendants' argument, the fact that the challenged ordinances undisputedly involve

---

[5] The government-speech cases on which Defendants rely did not involve the government compelling unwilling private parties to convey the government's message and, therefore, those cases are inapplicable here. *See Summum*, 555 U.S. at 467–73 (involving permanent monuments displayed on public property); *Johanns*, 544 U.S. at 557–62 (involving government-subsidized advertising). The fact that the government is permitted to "enlist[ ] private entities to convey its own message," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995), does not mean that that government has unfettered authority to *compel* private entities to do so.

8

"government speech" does not immunize the ordinances from constitutional scrutiny because Plaintiffs' challenge pertains to the compelled nature of the speech at issue.

Defendants argue that, even if their ordinances are not immune from constitutional scrutiny, only an intermediate level of scrutiny should apply. The level of constitutional scrutiny the Court must apply depends on whether Defendants' ordinances are content-neutral laws or content-based laws. A regulation of speech is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 135 S. Ct. at 2227. Laws "compelling individuals to speak a particular message" are content-based regulations of speech because such laws necessarily alter the contents of an individual's speech. *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018); *accord Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994) ("Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny [as other content-based laws]."). Content-based regulations of speech "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 135 S. Ct. at 2226. In summary, content-based regulations of speech, including regulations that compel individuals to speak a particular message, are subject to strict-scrutiny analysis.

Defendants argue that intermediate scrutiny nonetheless should apply in this case because voter-registration information is factual, non-ideological, and implicates the fundamental right to vote. To be sure, the Supreme Court has "applied more deferential review to some laws that require professionals to disclose factual, noncontroversial information in their *commercial speech*." *Becerra*, 138 S. Ct. at 2372 (emphasis added)

9

(internal quotation marks omitted). But Defendants do not contend, nor does the record demonstrate, that voter-registration information is commercial speech. Indeed, voter-registration information does not propose any kind of commercial transaction and in no way relates to the products or services that landlords provide. *See id.* And strict-scrutiny review is not limited to compelled *ideological* speech. *See, e.g.*, *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795–801 (1988) (applying strict scrutiny to law that required professional fundraisers to disclose to donors the percentage of contributions given to charities). Moreover, the decisions on which Defendants rely that involve competing fundamental rights do not stand for the broad proposition that intermediate scrutiny applies to any First Amendment challenge that implicates a competing fundamental right, and those cases are legally and factually inapposite. *See Gannett Co. v. DePasquale*, 443 U.S. 368, 393 (1979) (involving journalist's temporary denial of access to court proceeding, not compelled speech); *Frazier v. Winn*, 535 F.3d 1279, 1285 (11th Cir. 2008) (balancing competing interests of parents in raising their children and students in exercising freedom of speech, observing that minors' constitutional rights are more limited in certain circumstances). To the extent that competing fundamental rights are implicated, those competing rights are accounted for when evaluating whether the challenged regulation involves a compelling government interest. Accordingly, Defendants' intermediate-scrutiny arguments fail.

For these reasons, strict-scrutiny analysis applies to the challenged ordinances in this case.

## II. Strict-Scrutiny Analysis

To survive strict scrutiny, Defendants must prove that the challenged ordinances serve a compelling government interest and are narrowly tailored to achieve that interest. *Reed*, 135 S. Ct. at 2231. Although strict scrutiny is a difficult standard to satisfy, the Supreme Court has cautioned that it is not "strict in theory, but fatal in fact." *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1666 (2015) (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995)).

### A. Compelling Government Interest

The first part of the strict-scrutiny inquiry considers whether the challenged ordinances serve a compelling government interest. Defendants contend that the challenged ordinances serve a compelling government interest in providing voter-registration information to renters, who are underrepresented in voter participation, so as to reduce the disparity in the number of renters who vote compared to the number of homeowners who vote.

The right to vote "is regarded as a fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *accord McLain v. Meier*, 637 F.2d 1159, 1163 (8th Cir. 1980) (observing that "voting is of the most fundamental significance under our constitutional structure' and requires jealous protection" (quoting *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979))). The Supreme Court repeatedly has recognized the government's compelling interests in protecting voters from confusion or undue influence, preserving the integrity of the election process, and ensuring that an individual's right to vote is not undermined.

*Burson v. Freeman*, 504 U.S. 191, 199 (1992). Plaintiffs do not appear to dispute the compelling nature of Defendants' interests here. There is no genuine dispute of fact as to the purpose of the ordinances, which is to educate voters, prevent voter confusion, reduce impediments to renters exercising their right to vote, and reduce disparities in voter participation between renters and homeowners. Nor do Plaintiffs identify a genuine dispute as to the statistical disparity between homeowners who vote and renters who vote. Defendants have, therefore, identified a compelling government interest that the challenged ordinances are intended to serve.

**B.     Narrow Tailoring**

To survive strict scrutiny, however, Defendants must do more than demonstrate the existence of a compelling government interest—they also must demonstrate that their ordinances are narrowly tailored to serve that interest. *See id.* at 198–99; *Reed*, 135 S. Ct. at 2231.

The First Amendment requires that content-based speech laws "be narrowly tailored, not that [they] be 'perfectly tailored.' " *Williams-Yulee*, 575 U.S. at 454 (quoting *Burson*, 504 U.S. at 209). But when a less restrictive or less burdensome means is available for the government to achieve its goal, "the Government must use it." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 815 (2000). Content-based speech laws must be "narrowly drawn" to address the government's compelling interest, and the curtailment of free speech must be "actually necessary to the solution." *Brown v. Entm't Merch. Ass'n*, 564 U.S. 786, 799 (2011). "Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching on

our most precious freedoms." *Riley*, 487 U.S. at 801 (internal quotation marks omitted). Because Defendants' ordinances are presumptively unconstitutional content-based speech regulations, it is Defendants' burden to prove that the ordinances are narrowly tailored to serve Defendants' compelling governmental interest. *See Becerra*, 138 S. Ct. at 2371; *Reed*, 135 S. Ct. at 2231.

Plaintiffs contend that the Defendants' ordinances are underinclusive because they target only new tenants, thereby excluding existing tenants.[6] Although "underinclusivity raises a red flag, the First Amendment imposes no freestanding 'underinclusiveness limitation.' " *Williams-Yulee*, 575 U.S. at 449 (quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 387 (1992)). "It is always somewhat counterintuitive to argue that a law violates the First Amendment by abridging *too little* speech." *Id.* at 448. But "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes." *Brown*, 564 U.S. at 802. It is undisputed that Defendants' ordinances are limited to targeting new tenants—either at the time these tenants first sign a lease or at the time of first occupancy. By operation, Defendants' ordinances fail to include tenants whose lease or occupancy preexisted the enactment of the ordinances. Defendants offer no evidence about the proportion of tenants in Minneapolis or Saint Paul who are "new" tenants as compared to existing tenants. This underinclusivity raises doubt as to whether Defendants'

---

[6] Plaintiffs also argue that the ordinances are underinclusive because they do not target homeowners. But this fact is immaterial because the intended purpose of the ordinances is to educate and increase voter participation by *renters* to reduce the disparity in voter participation between homeowners and renters. Defendants are not obligated to address other problems that either do not exist or are beyond the scope of the problem they are confronting. *See Burson*, 504 U.S. at 207.

13

ordinances are appropriately tailored to advance the compelling interest of educating and increasing voter participation by *all renters*.

Even with respect to new tenants, the efficacy of Defendants' ordinances is unclear. Defendants argue that their ordinances "are a singularly effective way of communicating voter registration information to renters." But Defendants offer no *evidence*, nor specific arguments, to support this conclusory assertion. Notably, the voter-participation statistics on which Defendants rely are nationwide statistics that are not specific to either Minneapolis or Saint Paul. But even if those statistics are reflective of Minneapolis and Saint Paul, there is nothing in the record that addresses the actual or purported effectiveness of Defendants' ordinances. For instance, Defendants provide no evidence as to the percentage of tenants who receive the voter-registration flyers, as to how many of those renters actually review the flyers or find them helpful, or that the flyers have had any actual effect on *voter participation* among renters. Nor is there anecdotal evidence that similar efforts elsewhere have resulted in higher voter participation among renters.[7] It is Defendants' burden to demonstrate that their ordinances are "actually necessary" to solving the problems they have identified. *Brown*, 564 U.S. at 799. But rather than attempting to satisfy this burden, Defendants assume the Court will take their word for it.

---

[7] In fact, Defendants submitted only three exhibits with their summary judgment briefing. Two of those exhibits are copies of each city's voter-registration informational sheet, which were already part of the record. The third exhibit is a University of Notre Dame journal article addressing the effectiveness of "voter registration drives" that involved "face-to-face visits encouraging voter registration." This evidence, assuming it is admissible, has minimal (if any) relevance to the challenged ordinances, which do not include face-to-face voter-registration drives.

Plaintiffs also argue that Defendants' ordinances are not narrowly tailored because other less-restrictive means are available for Defendants to achieve their goals. These less-restrictive alternatives that Plaintiffs identify include delivering brochures to apartment buildings or other locations, conducting voter-registration drives at community events, mailing voter-registration information directly to tenants, or enlisting willing messengers—including willing landlords—to voluntarily convey the information. The record reflects that these alternatives were presented to Defendants before the ordinances were enacted. The record does not reflect, however, why these alternatives are insufficient.

Defendants argue that the alternatives identified by Plaintiffs "are simply not as likely to be successful or practical." But again, Defendants offer no *evidence*, nor specific arguments, to support this conclusion. Defendants' bare assertions are insufficient to survive strict scrutiny. *See, e.g.*, *Playboy Entm't Grp.*, 529 U.S. at 827 (concluding that government failed to show that challenged regulation was least-restrictive means of addressing the government's compelling interest); *Riley*, 487 U.S. at 800 (concluding that disclosure requirement was not narrowly tailored because "the State may itself publish the detailed financial disclosure forms" which "would communicate the desired information to the public without burdening a speaker with unwanted speech"); *Gralike v. Cook*, 191 F.3d 911, 921 (8th Cir. 1999) (invalidating state law because less-restrictive means would "advance the State's interest in informing voters without compelling [individuals] to speak or restricting their right not to speak"); *Masonry Bldg. Owners*, 394 F. Supp. 3d at 1307–08 (concluding that ordinance did not survive strict scrutiny in part because government argued, without evidence, that challenged ordinance would be effective and the purported

alternatives would be ineffective); *PSEG Long Island*, 158 F. Supp. 3d at 167–68 (same). Because Defendants' ordinances are presumptively unconstitutional, and it is Defendants' burden to demonstrate that the ordinances are narrowly tailored, this dearth of evidence is fatal to Defendants' argument in opposition to Plaintiffs' motion for summary judgment.

Rather than demonstrating that the challenged ordinances are necessary to achieving Defendants' goals, or that less-restrictive alternatives would be less effective, Defendants focus their argument on the "minimal" burden the ordinances place on landlords. It is true that the ordinances do not require landlords to procure, print, or pay for the flyers disseminated by Defendants and that the content of the flyers appears to be nonpartisan and is clearly attributed to Defendants. But the constitutionally relevant burden placed on Plaintiffs here is not a financial burden, nor is it an issue of inconvenience or partisanship. Rather, the relevant burden is that the government is "putting particular messages in the mouths of private speakers," namely, *unwilling* speakers. *Cressman*, 798 F.3d at 950 (internal quotation marks omitted); *accord Walker*, 135 S. Ct. at 2246. When the government seeks to disseminate a message, "no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." *Wooley*, 430 U.S. at 717; *accord Riley*, 487 U.S. at 797–98 (invalidating law compelling nonideological speech and observing that "compulsion burdens protected speech" whether it involves statements of opinion or statements of fact). For these reasons, Defendants' arguments as to the minimal burden that their ordinances place on landlords are unavailing.

In summary, Defendants have not demonstrated that the challenged ordinances are narrowly tailored to serve the undisputedly compelling government interest that the ordinances purport to address. Nor have Defendants identified a genuine dispute of material fact that would preclude summary judgment in Plaintiffs' favor. The Court recognizes Defendants' laudable goal of encouraging participation in such a fundamental practice of our democracy as voting. But this goal cannot be achieved by the unconstitutional means of compelled speech. Defendants' ordinances violate the First Amendment and are facially unconstitutional as a matter of law because the ordinances are an impermissible content-based regulation of speech that in every application would compel an individual to convey Defendants' message. Accordingly, Plaintiffs' motion for summary judgment is granted, and Defendants' motion for summary judgment is denied.[8]

**ORDER**

Based on the foregoing analysis and all of the files, records, and proceedings herein,

**IT IS HEREBY ORDERED**:

1. Plaintiffs' motion for summary judgment, (Dkt. 11), is **GRANTED** as follows:

---

[8] Plaintiffs' memorandum of law in support of their motion for summary judgment refers to their entitlement to damages, attorneys' fees, and costs, but Plaintiffs provide no argument or evidence in support thereof. A request for damages, attorneys' fees, or costs must be made by separate motion and memorandum of law addressing the legal and factual support for the requested relief. Any such motion, and any response or reply thereto, shall comply with the deadlines and requirements set forth in Local Rule 7.1(c) governing dispositive motions.

a. Saint Paul, Minn., Code of Ordinances ch. 48, § 48.02, is **DECLARED** facially unconstitutional, and Defendant City of Saint Paul is **PERMANENTLY ENJOINED** from enforcing Saint Paul, Minn., Code of Ordinances ch. 48, § 48.02.

b. Minneapolis, Minn., Code of Ordinances ch. 244, art. XVI, § 244.2000(f), is **DECLARED** facially unconstitutional, and Defendant City of Minneapolis is **PERMANENTLY ENJOINED** from enforcing Minneapolis, Minn., Code of Ordinances ch. 244, art. XVI, § 244.2000(f).

2. Defendants City of Saint Paul and City of Minneapolis's motion for summary judgment, (Dkt. 27), is **DENIED**.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: March 2, 2020         s/Wilhelmina M. Wright
                              Wilhelmina M. Wright
                              United States District Judge