

KeyCite Blue Flag – Appeal Notification

Appeal Filed by RESCAP LIQUIDATING TRUST v. HOME LOAN CENTER, INC., 8th Cir., July 23, 2019

### 399 F.Supp.3d 827

Editor's Note: Additions are indicated by Text and deletions by ~~Text~~ .

## United States District Court, D. Minnesota.

## IN RE: RFC and ResCap Liquidating Trust Action
### This document relates to:
### ResCap Liquidating Trust
### v.
### Home Loan Center, Inc.

## Case No. 13-cv-3451 (SRN/HB), Case No. 14-cv-1716 (SRN/HB)
|
### Signed 06/12/2019
|
### Filed 06/21/2019

**Synopsis**

**Background:** After collapse of residential mortgage-backed securities (RMBS) market, insolvent buyer and securitizer of residential mortgage loans sued sellers, as originating lenders/clients, claiming breach of contract as to representations and warranties regarding quality and credit characteristics of loans and claiming indemnification, under client guide incorporated into client contract between parties, for defective loans as well as for settlements, with RMBS trustees and bond insurers, that were incorporated into purchaser's approved bankruptcy plan. The District Court, Susan Richard Nelson, J., 332 F.Supp.3d 1101, granted in part and denied in part the parties' cross-motions for summary judgment. The case proceeded to trial, and jury returned $28.7 million verdict in favor of buyer/securitizer. The District Court, at 2019 WL 1237166, granted in part buyer/securitizer's motion for prejudgment interest. Subsequently, buyer/securitizer filed motion for attorney fees and costs.

**Holdings:** The District Court, Susan Richard Nelson, J., held that:

public policy warranted consideration of reasonableness of attorney fee request, even though guide incorporated in parties' contract expressly provided for all attorney fees and costs incurred in enforcing the contract, without limitation;

## EXHIBIT 10 - MOHRMAN DECLARATION

district court would not exclude testimony of expert for seller in calculating reasonable attorney fees award, but would not give expert's testimony significant weight;

disclosure of unredacted attorney billing statements submitted by buyer was not required for calculating attorney fees;

attorney fees requested by buyer in the amount of $28.3 million would be allowed in reduced amount of $18,002,732.84;

award of attorney fees for work expended in preparing the fee petition was appropriate;

costs requested by buyer in the amount of $5,078,519.47 were reasonable and would be allowed.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion for Attorney's Fees; Motion for Costs.

## *830  MEMORANDUM OPINION AND ORDER RE: ATTORNEYS' FEES

SUSAN RICHARD NELSON, United States District Judge

Before the Court is the Motion for Attorneys' Fees and Costs [Doc. No. 4852] filed by Plaintiff ResCap Liquidating Trust ("ResCap"). For the reasons set forth below, Plaintiff's motion is granted in part and denied in part.

### *831  I. BACKGROUND

The Court has previously discussed the uniquely complex legal issues undergirding this contractual indemnification suit in numerous orders and opinions, most notably in its 182-page summary judgment opinion. *See In re ResCap Liquidating Trust Action*, 332 F. Supp. 3d 1101 (D. Minn. 2018). Accordingly, the Court will not revisit the many, and varied, legal issues that have arisen over the course of this five-year litigation.

However, for purposes of this attorneys' fees decision, the Court will recount the equally complex *procedural* history of this case. Such background is necessary in light of HLC's repeated and extraordinary contention that an unusually high fees award is not warranted because this case, and this jury trial, involved nothing more than a standard "two-party contract case" between commercial entities. (Def.'s Opp'n [Doc. No. 4979] at 1, 4; *see also* Expert Decl. of Sam Hanson [Doc. No. 4997] ("Hanson Decl.") at 3 (describing this case as a "single-plaintiff, single-defendant

<span style="color:red">EXHIBIT 10 - MOHRMAN DECLARATION</span>

contract case").) For the reasons detailed below, this characterization is completely off the mark and omits a great deal of context.

### A. Following a Multi-Billion Dollar Bankruptcy, the ResCap Liquidating Trust Brings Dozens of Related Contract Suits in this District

As this Court has explained before, the roots of this case lie in the bankruptcy of the Minnesota company formerly known as the Residential Funding Corporation ("RFC"). To briefly recap: following the collapse of the housing market in 2008, RFC was sued by various "Trusts" and "Monoline Insurers" for breaching the "representations" and "warranties" ("R&Ws") RFC made when selling those entities (or their insureds) "residential mortgage-backed securities" ("RMBS"), *i.e.*, bundles of home mortgages. *In re ResCap*, 332 F. Supp. 3d at 1122-24. Faced with tens of billions of dollars in liability, RFC filed for bankruptcy in May 2012. While in Bankruptcy Court, and after much negotiation, RFC reached a series of settlements, totaling approximately $9 billion, with the RMBS Trusts and several of the Monoline Insurers. *Id.* at 1124. In December 2013, in a 134-page order, Judge Martin Glenn of the Bankruptcy Court of the Southern District of New York approved these settlements as "fair and reasonable." *Id.* at 1124-25. Moreover, at the hearing in which Judge Glenn approved the settlements, he observed that "this case is certainly the most legally and factually complicated case that I've presided over in my seven years on the bench," and that "ResCap presented more unsettled legal issues than I've seen in one case before, whether during my seven years on the bench or thirty-four years in law practice before that." (Dec. 11, 2013 Hr'g Tr. Excerpts [Doc. No. 5013] at 43-44.)

However, the conclusion of RFC's "legally and factually complicated" bankruptcy marked only the beginning of the present case(s). *Id.* As part of the bankruptcy settlements, RFC's creditors formed the ResCap Liquidating Trust to sue the dozens of banks and mortgage lenders that had sold RFC the loans bundled into RFC's securities, on grounds that those lenders breached *their* (corresponding) R&Ws to RFC, and thus directly caused RFC to breach *its* R&Ws to the Trusts and Monoline Insurers, which, in turn, contributed to RFC incurring $9 billion in liabilities. *In re ResCap*, 332 F. Supp. 3d at 1144. ResCap grounded its claims against the lenders in the "Client Contract" those lenders had signed with RFC, which itself incorporated another, lengthier contract called the "Client Guide." *Id.* at 1118.

Importantly, the Client Guide not only contained a series of R&Ws that lenders made to RFC upon each loan sale, such as **\*832** a promise that all of the borrower information the lender provided RFC was accurate, but it also contained a broad "indemnification" provision requiring the originating lender to indemnify RFC from "all losses or liabilities" arising from the lender's R&W breaches. *See generally id.* at 1151-54 (describing the stringency of the Client Guide's indemnification provisions for breached R&Ws, which afforded RFC "considerable discretion"

EXHIBIT 10 - MOHRMAN DECLARATION

in determining whether a breach had occurred, as well as "wide-ranging remedies"). Notably for present purposes, the Client Guide also included a "wide-ranging remedy" in the form of a fee-and-cost-shifting provision. (*See* Client Guide § A212 [Doc. No. 3244-2] at 68 ("The Client also shall indemnify GMAC-RFC and hold it harmless against all court costs, attorney's fees and any other costs, fees and expenses incurred by GMAC-RFC in enforcing the Client Contract.").)

Armed with this contract, and the $9 billion in "losses and liabilities" incurred by RFC in the bankruptcy settlements, in late 2013 and early 2014 ResCap [1] proceeded to file dozens of materially identical lawsuits in Minnesota state and federal courts against a wide range of mortgage lenders, all alleging breach of contract and contractual indemnification under the Client Guide. (*See* Horner Decl., Ex. 3 [Doc. No. 4858-3] at 1 ("Consolidated Case Chart") (noting that ResCap filed 73 such "Phase I" lawsuits in 2013 and 2014, 67 of which were in Minnesota courts).) [2] One of these lawsuits was against HLC. *See Residential Funding Co., LLC v. Home Loan Center, Inc.*, No. 14-cv-1716 (DWF/JJK).

[1]   Although these lawsuits listed the plaintiffs as "RFC" *and* the "ResCap Liquidating Trust," the Court will generally refer to the plaintiff as "ResCap" because it has always been the true party in interest in this case.

[2]   ResCap appeared to file the vast majority of these suits in Minnesota courts because of a venue selection clause in the Client Guide. *See RFC v. Cherry Creek Mortg. Co., Inc.*, No. 13-cv-3449 (JNE/SER), 2014 WL 1686516, at *4 (D. Minn. Apr. 29, 2014) (detailing the venue selection clause, and denying an early motion by ResCap to transfer one of the at-issue cases to the Bankruptcy Court of the Southern District of New York); *RFC v. First Guar. Mortg., Co.*, No. 13-cv-3475 (RHK/JJG), 2014 WL 12600840 (D. Minn. May 13, 2014) (same). Moreover, at the end of 2016 and beginning of 2017, ResCap filed ten more lawsuits against mortgage lender-defendants. (*See* Horner Decl. [Doc. No. 4857] ¶ 4 (deeming these "Phase II" lawsuits).) Because these Phase II lawsuits are not particularly pertinent to the present motion, the Court will only reference them when necessary.

At the outset of this litigation, ResCap was represented solely by attorneys at the Minneapolis firm Felhaber Larson (RFC's longstanding local counsel), as well as attorneys at the Columbus, Ohio law firm of Carpenter, Lipps & Leland LLP (RFC's bankruptcy counsel). However, early on in the process, ResCap, in conjunction with its existing counsel, realized that it "needed to obtain *national* counsel with significant RMBS litigation and RMBS-related bankruptcy expertise to represent [it] in [the HLC] case and the many dozens of other cases like it." (Heeman Decl. [Doc. No. 5010] ¶ 9 (emphasis added).) Indeed, "[ResCap] could not locate counsel in Minneapolis/St. Paul with the requisite expertise who were capable and able to litigate these cases, particularly in light of the many conflicts that law firms in this market had due to their ongoing representation of many of the defendant-originators in these cases." (*Id.*) This need for national counsel was further

<span style="color:red">EXHIBIT 10 - MOHRMAN DECLARATION</span>

amplified by the fact that the "overwhelming majority of Defendants in these cases, including Home Loan Center, [also] hired lead counsel from outside of Minnesota," often from some of the most prestigious law firms in the country. (*Id.* ¶ 11; *see also* Nesser Decl. [Doc. No. 4856] ¶ 6 (noting that, in addition to **\*833** Williams & Connolly's representation of HLC, other defendants "engaged law firms including Jones Day; Munger, Tolles & Olson; Orrick, Herrington & Sutcliffe; Ropes & Gray; Simpson Thatcher & Bartlett; Sullivan & Cromwell; and Wachtell, Lipton, Rosen & Katz").)

As such, in early 2014, ResCap retained the nationally recognized litigation firm of Quinn, Emanuel, Urquhart & Sullivan, LLP, in addition to Felhaber Larson and Carpenter, Lipps, and Leland. (*See* Nesser Decl. ¶ 3.) ResCap did so because of Quinn Emanuel's well-regarded RMBS, bankruptcy, and insurance litigation work, including "its success in recovering over $25 billion for the Federal Housing Finance Agency in ground-breaking RMBS litigation." (*Id.* ¶ 2.) The representation agreement between ResCap and Quinn Emanuel called for Quinn Emanuel to discount its hourly billing rates by [redacted] in return for "an [redacted] contingency fee on any 'recovery.' " (Horner Decl. [Doc. No. 4857] ¶ 12 [redacted].

### B. Pre-Trial Consolidation Through Summary Judgment

In the early days of this litigation, the ResCap cases were handled on an individual basis, with each judge in the District presiding over approximately two to seven cases. *See, e.g.*, *Residential Funding Co. v. Academy Mortg., Corp.*, 59 F. Supp. 3d 935 (D. Minn. 2014) (denying a joint motion to dismiss filed by the six defendant-originators whose cases were then pending before the undersigned). However, faced with the potential for conflicting decisions and inefficient discovery management in cases with overlapping fact patterns, in January 2015 the judges of the District jointly agreed to consolidate the then-59 active "ResCap cases" before the undersigned judge, Magistrate Judge Keyes, and Magistrate Judge Bowbeer "for all pre-trial purposes, including the coordination of all discovery matters, settlement discussions, nondispositive motions and dispositive motions, other than summary judgment and trial." (*See* Jan. 27, 2015 Consolidation Order [Doc. No. 100] at 3.)[3] As part of this Order, all case activity was transferred to the consolidated case docket: 13-cv-3451 (D. Minn.). The case then proceeded through joint discovery for the next three years, with this Court and the two magistrate judges holding frequent, in-person, lengthy case management conferences with all participating counsel.[4] During discovery, the complexity of these cases became readily apparent, as ResCap undertook the daunting task of attempting to apportion billions of dollars in liabilities across dozens of defendants, and among the tens of thousands of individual mortgage loans that defendants had sold to RFC over the course of the 2000s. Simultaneously, ResCap prepared a case against the many, and sometimes individualized, contract law defenses asserted by defendants, of which HLC was just one. Indeed, early on in discovery, the Court approved a "statistical sampling" discovery protocol, largely

EXHIBIT 10 - MOHRMAN DECLARATION

because of this litigation's unique "complexity." *See In re ResCap*, 2015 WL 1746311, at *3 (D. Minn. Apr. 16, 2015) (preliminarily approving "statistical sampling" for the 23 defendants, including **\*834** HLC, who sold RFC over 500 at-issue loans, and noting that "[t]he establishment of a statistical sampling disclosure schedule will assist the parties and the Court in managing such discovery in this very complex litigation").

3   Although the Consolidation Order referenced 68 cases, the declaration of Ms. Jill Horner (ResCap's Chief Financial Officer) correctly notes that, because nine of the referenced cases were either default cases, *sui generis* "loan-level" cases, or simultaneously settled cases, the best number to use for initially "active" cases in the Consolidated Action is 59. (*See* Horner Decl. ¶ 3.)

4   Although Magistrate Judge Keyes's day-to-day participation in this litigation concluded upon his retirement in 2016, he continued to play a seminal role as a private mediator in facilitating settlements between ResCap and individual defendants in the years afterwards.

Moreover, during this time, ResCap's three-firm legal team, totaling well over one hundred attorneys and staff, "responded to over 1,000 common written discovery requests," "produced over 3,000,000 RFC documents (consisting of nearly 24,000,000 pages) to Defendants, including HLC," "produced almost 9,000 additional documents exclusively to HLC (consisting of nearly 650,000 pages), "defended over 150 fact depositions noticed in the HLC case," and "reviewed hundreds of thousands of third-party documents and participated in third-party depositions subpoenaed in the Consolidated Actions." (Nesser Decl. ¶ 7; *see generally* Doc. Nos. 100-3190.)

On April 3, 2018, ResCap and the remaining nine defendants in the Consolidated Action (the other 50 defendants had settled [5]), filed dueling summary judgment motions on "common issues," as well as *Daubert* motions. (*See* Doc. Nos. 3194, 3243, 3251, 3253, 3264, 3421, 3518, 3602, 3713, 3720, 3884, 3889, 3894, 3909.) Collectively, the briefing totaled nearly 600 pages (not to mention thousands of additional pages in evidentiary submissions), and discussed numerous "common disputed issues," along with the proposed testimony of 20 expert witnesses. Moreover, HLC, along with defendants Standard Pacific Mortgage and CTX Mortgage, filed defendant-specific briefing as to certain issues, and ResCap responded in kind. (*See* Doc. Nos. 3500, 3580, 3617, 3788, 3794.) On June 19 and 20, 2018, the Court entertained approximately 15 hours of oral argument on these motions. (*See* Doc. Nos. 3924, 3927; *see also* Doc. No. 4138 (noting that, on August 3, 2018, the Court heard another hour of oral argument on Standard Pacific's defendant-specific summary judgment motion).)

5   By this point, ResCap and HLC had held two unsuccessful, court-supervised mediations, first in August 2016 and then again in March 2018. (*See* Nesser Decl. ¶ 9.)

<div align="center">EXHIBIT 10 - MOHRMAN DECLARATION</div>

On August 15, 2018, the Court issued its summary judgment opinion. The decision resolved some issues in favor of ResCap, other issues in favor of the remaining defendants, and left yet other issues for jury determination. For instance, the Court ruled that ResCap had sole discretion under the Client Guide to determine R&W breaches, that ResCap could prove its case with statistical sampling, and that ResCap could seek indemnification for the liabilities it incurred during the bankruptcy, rather than just out-of-pocket losses. *See In re ResCap*, 332 F. Supp. 3d at 1151, 1154, 1158. The Court also ruled against ResCap, finding that two of the three damages models it proffered (both of which provided for substantially higher damages than the model the Court found acceptable) were not admissible, and that much of ResCap's breach of contract claim (ResCap's alternative to its contractual indemnification claim) was time-barred. *See id.* at 1189, 1198, 1205. [6]

[6]   ResCap later agreed to drop its breach of contract claim as to all remaining defendants. (*See* Oct. 4, 2018 Stipulation [Doc. No. 4513].)

Most importantly, though, the summary judgment opinion left a number of complex issues for jury determination, both with respect to HLC's case in particular and the remaining defendants' cases in general. (*But cf.* Def.'s Opp'n at 19 (describing the case as "significantly less complicated" after summary judgment).) For instance, the jury would have to determine whether the Client Guide even applied to the (thousands of) at-issue loans, either as a matter of contract formation or as an equitable **\*835** matter based on RFC's conduct. *See In re ResCap*, 332 F. Supp. 3d at 1118 n.5 (applicability of Client Guide), 1175 (defendants' equitable estoppel defenses to application of Client Guide). The jury would also have to determine if ResCap's surviving damages model provided a "reasonably certain" basis by which to allocate damages as to individual defendant-lenders, *id.* at 1203-04, as well as whether the multi-billion-dollar bankruptcy settlements entered into by RFC were "reasonable and prudent." *Id.* at 1157. [7] There also remained outstanding factual questions concerning causation and allocation. *See, e.g., id.* at 1168-69 (declining to determine causation as a matter of law, in part because of defendants' "RFC sole responsibility" defense). [8]

[7]   Moreover, in accordance with defendants' joint request, the Court subsequently ruled that the Seventh Amendment required that the bankruptcy settlements' "reasonableness" be tried to the jury alongside the rest of ResCap's case (ResCap had argued that this issue should be resolved through a separate bench trial). *See In re ResCap*, 2018 WL 4469249 (D. Minn. Sept. 18, 2018).

[8]   The Court also notes that, as a general matter, at summary judgment both the Court and the parties were faced with the difficult task of attempting to apply traditional Minnesota contract, insurance, and indemnification principles to the relatively uncharted territory of complex RMBS litigation, *e.g.*, determining the proper causal standard for indemnification under the Client Guide. Indeed, just as Judge Glenn noted with respect to RFC's bankruptcy, the Court found the issues presented at summary judgment among "the most legally and

EXHIBIT 10 - MOHRMAN DECLARATION

factually complicated" it has had to resolve in its many years on the bench. (Dec. 11, 2013 Hr'g Tr. Excerpts at 43.)

### C. Following the Court's Summary Judgment Decision, ResCap Fully Turns Its Attention to the "Bellwether" HLC Trial

Although ResCap continued to simultaneously litigate its case against multiple defendants in the weeks after the summary judgment ruling (*see, e.g.*, Doc. No. 4335 (noting six-hour motion in limine hearing on August 23, 2018 between ResCap, on the one side, and HLC, CTX, and Standard Pacific, on the other)), by September 14, 2018, following a final, unsuccessful settlement conference between ResCap and HLC, ResCap turned its attention fully toward the forthcoming HLC trial, which was set to commence on October 15, 2018. (*See* Doc. No. 4455 (noting first pre-trial conference, on September 14, 2018, dealing solely with the HLC trial); *accord* Horner Decl. ¶ 20 (attesting that, between September 15, 2018 and the conclusion of the HLC trial, all of ResCap's attorneys' "Consolidated Action" billing time was solely connected to the HLC case).) [9] Given the likely impact the HLC trial would have on the remaining nine defendants' trials (and/or settlement prospects), ResCap prepared an extremely thorough and detailed case to present to the jury, as if this were a "bellwether" trial. (*See* Sept. 19, 2018 ResCap Witness and Exhibit Lists [Doc. Nos. 4466-67] (listing 4,537 exhibits and 29 live witnesses).)

[9]    The next two trials in line, the Standard Pacific and CTX trials, were set to begin on February 25, 2019. (*See* Trial Notice [Doc. No. 4493].)

As reflected in its September 19 witness and exhibit lists, HLC had also prepared a vigorous case in defense. (*See* Sept. 19, 2018 HLC Witness and Exhibit Lists [Doc. Nos. 4465, 4467] (listing several thousand exhibits and 26 live witnesses).) Moreover, in the weeks approaching trial, HLC litigated the scope of the Court's summary judgment order extensively, particularly as it related to its "RFC sole responsibility" defense. Indeed, in the month before trial, the Court held four HLC-specific, in-person pre-trial conferences to address these disputes (*see* Doc. Nos. 4455 (Sept. 14), 4480 (Sept. 21), 4516 (Oct. 4), 4580 (Oct. **\*836** 9)), and issued several written orders following those conferences. *See, e.g.*, *In re ResCap*, 2018 WL 4863597 (D. Minn. Oct. 8, 2018) (motions in limine); *In re ResCap*, 2018 WL 4929393 (D. Minn. Oct. 11, 2018) (admissibility of certain proofs of claim); *In re ResCap*, 2018 WL 4929394 (D. Minn. Oct. 11, 2018) (admissibility of certain evidence available to RFC at the time of settlement).

On the eve of trial, HLC identified 19 live witnesses and over 150 exhibits in its final pre-trial witness and exhibit lists [Doc. Nos. 4531, 4612].

### EXHIBIT 10 - MOHRMAN DECLARATION

### D. The HLC Trial

From October 15 to November 7, 2018, the parties tried this case before a jury. ResCap presented its case from October 16 to October 30 (approximately nine trial days). During this time, ResCap offered the jury the testimony of 15 fact witnesses (six live, nine videotaped), and five expert witnesses, along with approximately 55 exhibits and numerous demonstrative PowerPoint slides. (*See* ResCap's Rev'd Tr. Ex. List [Doc. No. 4733].)

In presenting its case, for which it bore the burden of proof, ResCap had to provide the jury with (a) a thorough explanation of how mortgage securitization worked, and how RFC's Client Guide and "R&Ws" connected to that complex financial practice, (b) a detailed account of how RFC ended up in bankruptcy, and the kind of claims RFC was facing in its bankruptcy, (c) a complete justification for the reasonableness and good faith of the multi-billion-dollar bankruptcy settlements for which ResCap sought indemnification, (d) an exposition on how ResCap's experts "re-underwrote" numerous loans in this case, and how that re-underwriting showed that HLC's breaches caused a portion of RFC's bankruptcy settlements and (e) a full accounting for ResCap's "Allocated Breaching Loss" damages model, which relied on complex statistical sampling across multiple loan populations. In the Court's experience, this kind of evidentiary presentation differs greatly from the standard two-party contract dispute in Minnesota federal district court. *Accord In re ResCap*, 2018 WL 4929394, at *1 (explaining that "the Bankruptcy Settlements differ from the usual *Miller-Shugart* settlement, and this litigation differs from the usual indemnification litigation under Minnesota law"). It also bears mentioning that, although HLC engaged in a thorough cross-examination of some of ResCap's witnesses, especially Dr. Snow and Mr. Hawthorne, HLC did not cross-examine other of ResCap's witnesses at length.[10]

[10]    While HLC cross-examined four of ResCap's live witnesses at some length, for over 35 transcript pages (Mr. Hawthorne (125 pages), Dr. Snow (100 pages), Ms. Martha Forget (70 pages), and Mr. Jeffrey Lipps (60 pages)), for others, HLC's cross-examinations of ResCap's three re-underwriting experts lasted less than 35 pages combined (Dr. Richard Payne (10 pages), Mr. Louis Dudney (15 pages), and Mr. Steve Butler (9 pages)).

For its part, HLC ultimately put on a narrower presentation than its pre-trial exhibit and witness lists portended. Over the course of approximately three and a half trial days, HLC offered the jury the testimony of only six fact witnesses (two live, four videotaped), and two expert witnesses, along with approximately 40 exhibits. (*See* HLC's Tr. Ex. List [Doc. No. 4703].) Further, unlike ResCap's expert witnesses, HLC's "reasonableness expert," Mr. Phillip "Buck" Burnaman, only attacked a relatively small portion of ResCap's reasonableness case (set forth by Mr. Hawthorne), and did not offer an affirmative opinion on reasonableness. (*See* HLC JMOL Order [Doc. No. 5131] at 16) (discussing Burnaman testimony in greater detail). Similarly, HLC's "damages expert," Dr. Justin

EXHIBIT 10 - MOHRMAN DECLARATION

McCrary, only attacked Dr. Snow's statistical sampling as unreliable, **\*837** and did not offer the jury an alternative damages model or a figure by which they could calculate HLC's "fair share" of RFC bankruptcy settlement liability. (*See, e.g.*, Trial Tr. at 2797 (McCrary cross) (acknowledging that he "was not asked to design a sample in connection with this case," and "also was not asked to put forward an affirmative damages estimate in this case").) Further, unlike HLC, ResCap engaged in a relatively lengthy cross-examination of almost all of HLC's live witnesses. [11]

[11]    Again, based on the Court's rough calculations, three of ResCap's four cross-examinations lasted over 35 transcript pages: Mr. Burnaman (60 pages), Dr. McCrary (50 pages), and Mr. Rian Furey (45 pages).

At the conclusion of HLC's case, following substantial briefing and oral argument, the Court granted ResCap JMOL on several issues, including the reasonableness of the settlements and HLC's equitable estoppel defense, largely because HLC had refuted ResCap's thorough trial presentation with only speculative evidence and attorney argument. (*See generally* JMOL Order). However, the Court allowed the critical question of the Client Guide's applicability to go to the jury, along with the questions of whether ResCap's damages model provided a "reasonably certain" basis on which to allocate damages, and, if so, what amount of damages HLC owed ResCap. *Id.*

Following approximately two-and-a-half hours of deliberation, the jury rendered a $28.7 million verdict in favor of ResCap, which was approximately 70% of the damages Dr. Snow testified was a conservative estimate of the damages to be allocated to HLC. (*See* Trial Tr. at 2098 (Snow) (stating that, under his Allocated Breaching Loss damages model, nearly $41.3 million was the most likely, conservative and reliable estimate of damages to be allocated to HLC).) [12]

[12]    The Court notes that in contrast to HLC's present description of this case as a standard "two-party contract dispute," at trial, HLC repeatedly stated that it was "one mortgage lender-defendant among many," and attempted to use this disparity to its advantage. (*See, e.g.*, Trial Tr. at 312 (HLC opening) (arguing that HLC was "a small fry in the RFC securitization[s] that were the subject of the bankruptcy settlements," and that "[o]ut of the more than two million loans involved in the settlements, [HLC] sold RFC less than one half of one percent of the loans"); *id.* at 2160, 2290, 2295 (Snow cross-examination) (eliciting testimony that Dr. Snow needed to use (arguably less precise) statistical sampling with respect to HLC's breach rate because he had to "draw[ ] samples for 20-plus originators" in the consolidated litigation); *id.* at 3456-57, 3459 (HLC closing) (again emphasizing that Dr. Snow's methodology was unreliable because he had to draw samples for "26 different cases" in the consolidated action, rather than focusing just on HLC); *cf. id.* at 3443 (HLC closing) (arguing that RFC did not intend for the Client Guide to apply to HLC's bulk loan sales because "seven correspondent

EXHIBIT 10 - MOHRMAN DECLARATION

lenders who had loans in the global sample sold loans for which they did not agree to be bound by RFC's Client Guide").)

### E. Subsequent Developments

Shortly after the jury's verdict, ResCap moved the Court to grant it prejudgment interest and attorneys' fees and costs, in accordance with the Client Guide's indemnification provisions. The Court recently granted, in part, ResCap's motion for prejudgment interest, which effectively increased ResCap's recovery to approximately $42.8 million. *See In re ResCap*, 2019 WL 1237166 (D. Minn. Mar. 18, 2019) (granting RFC $14,066,931.50 in pre-verdict interest, and a to-be-determined additional amount of interest on the time between the verdict and the present day).

Moreover, within three months of the conclusion of the HLC trial, all of the remaining "Phase I" defendants in the Consolidated Action had settled. Indeed, **\*838** one of these cases, First Mortgage, settled after ResCap secured multiple favorable rulings from this Court based almost entirely on successful legal arguments ResCap had advanced both before and during the HLC trial. *See, e.g.*, *RFC v. First Mortgage Corp.*, No. 13-cv-3490 (SRN/HB), 2018 WL 6727065 (D. Minn. Dec. 21, 2018).

### F. Procedural History of the Present Motion

ResCap filed the present motion for fees on January 5, 2019. (*See* Pl.'s Mem. Supp. of Fees and Costs [Doc. No. 4854] ("Pl.'s Mem."); *see also* Pl.'s Reply [Doc No. 5000].) In its motion, ResCap seeks contractual reimbursement for $28,745,901.93 [13] in HLC-related fees and costs incurred between December 2013 and January 2019. (*See* First Supp'l Horner Decl., Ex. 59 [Doc. No. 5004] (Rev'd Fee & Cost Summ.).) More specifically, ResCap seeks **(1)** $13,849,850.18 in fees for work performed by Quinn Emanuel attorneys and staff, **(2)** [redacted] additional $[redacted] contingency fee for work performed by Quinn Emanuel attorneys and staff, **(3)** $3,548,011.24 in fees for work performed by Felhaber Larson and Spencer Fane attorneys and staff, [14] **(4)** $972,274.13 in fees for work performed by Carpenter Lipps & Leland attorneys and staff, **(5)** $2,988,483.18 in costs for work performed by 15 expert witnesses and their support firms, **(6)** $226,057.09 in costs for work performed by two document vendors, and **(7)** $1,863,979.20 in costs for various trial witnesses and vendors, i.e., non-expert trial witnesses ($47,705.25), office space ($251,221.21), trial graphics ($328,166.41), and jury consulting ($1,236,886.33). (*See id.*; *see also* Horner Decl. (detailing these costs, and explaining how ResCap apportioned the cost of general consolidated action work to HLC in particular.) In sum, ResCap seeks $18,370,135.55 in attorneys' fees, plus a $[redacted] contingency fee. (*Id.*) It seeks $5,078,519.47 in costs. (*Id.*)

**EXHIBIT 10 - MOHRMAN DECLARATION**

13      The Court's total calculation of the itemized fee and cost summary, (*see* First Supp'l Horner Decl., Ex. 59 (Rev'd Fee & Cost Summ.)), is higher by one cent: $28,745,901.94. Nevertheless the Court will use Plaintiff's requested amount of $28,745,901.93.

14      After the conclusion of the HLC trial, counsel from Felhaber Larson moved to the firm of Spencer Fane, and continued their work for ResCap from there. (*See* First Supp'l Horner Decl. [Doc. No. 5002] ¶ 5.) Fees for Felhaber Larson, $3,459,311.29, + fees for Spencer Fane, $88,699.95, total $3,548,011.24.

HLC filed an opposition brief on February 11, 2019, and argued that ResCap's fee award "should be reduced to the range of $6.7 million to $11 million." (Def.'s Opp'n at 2.) In making this request, HLC primarily focused on ResCap's attorneys' fees incurred between July and November 2018, which it deemed "grossly excessive," in terms of both hours billed and attorneys utilized. (*Id.*; *see also id.* at 18 n.6 (noting that, "[f]or purposes of this opposition, HLC is not specifically challenging the excessiveness of the hours expended by [ResCap's] firms during the pre-July 2018 period").) HLC similarly argued that the trial and expert witness costs incurred by ResCap in that July-November 2018 time period were excessive. (*Id.* at 33-37.) Moreover, attached to its motion, HLC included a declaration from former Minnesota Supreme Court Justice Sam Hanson. In his declaration, Justice Hanson opined that ResCap's fee request was "unprecedented" for a "single-plaintiff, single-defendant contract case" in Minnesota, especially given the relative size of the jury's verdict and the relative hours billed by HLC's counsel, and that ResCap's fee award should be reduced accordingly. (*See* Hanson Decl. at 3.) Justice Hanson also opined that ResCap's fee award should generally be reduced by "25-50%" because of various **\*839** rulings the Court made against ResCap in its summary judgment decision. (*Id.* at 11-12) (noting the Court's elimination of ResCap's two "higher yielding" damages models at summary judgment).

In light of these dueling submissions, the Court entertained two and a half hours of oral argument on February 21, 2019. (*See* Doc. No. 5021.)

## II. DISCUSSION

### A. Whether a Reasonableness Standard Should Be Read into the Client Guide

Before delving into the particulars of ResCap's fee and costs request, the Court addresses a threshold question: must the Court even conduct a reasonableness analysis of ResCap's fees and costs *at all*? The necessity of addressing this question arises directly out of the Client Guide's fee-shifting language: "The Client also shall indemnify GMAC-RFC and hold it harmless against *all* court costs, attorney's fees and any other costs, fees and expenses incurred by GMAC-RFC in enforcing the Client Contract." (Client Guide § A212 at 68 (emphasis added).) Importantly, this

EXHIBIT 10 - MOHRMAN DECLARATION

provision does not contain the word "reasonable." *Compare with, e.g.*, 42 U.S.C. § 1988(b). As such, ResCap contends that the Court need not engage in a reasonableness analysis, and should simply "enforce the parties' agreement as written," which, after all, was negotiated by "two sophisticated business parties." (*See* Pl.'s Reply at 6-8.) HLC disagrees, and argues that the Court should "read a reasonableness requirement into" the Client Guide "as a matter of public policy." (Def.'s Opp'n at 6.)

The Court will first discuss ResCap's cited cases.[15] In support of its position, ResCap relies heavily on the Eighth Circuit decision, *Residential Funding Co. v. Terrace Mortgage*, 725 F.3d 910 (8th Cir. 2013), and argues that that decision "controls" the outcome here. (Pl.'s Reply at 4.) *Terrace* was a predecessor case to this one, in which RFC sought to enforce the Client Guide against a mortgage lender defendant over R&W breaches (albeit before RFC filed for bankruptcy and became the ResCap Liquidating Trust). In the relevant part of that decision, the Eighth Circuit affirmed this Court's award of fees and costs to RFC, and noted that the Client Guide "unambiguously" authorized RFC to recover its fees and costs "without limitation." *Terrace*, 725 F.3d at 922. In so ruling, the Eighth Circuit also stated that "[t]he only governing language is the contract the parties signed," and that "the kind of 'reasonableness' argument for which Terrace grasps is not present in the language of the contract." *Id.*

[15]  The parties agree that Minnesota law applies in this matter. As a general rule in Minnesota, each party bears its own attorneys' fees, absent a statutory or contractual exception, such as the fee-shifting provision in the Client Guide. *See* *In re Silicone Implant Ins. Coverage Litig.*, 667 N.W.2d 405, 422 (Minn. 2003).

The Eighth Circuit, in *Terrace*, was not confronted with the exact question of whether, as a matter of public policy, a court should always inquire into the reasonableness of attorney's fees and costs regardless of a contract's language, because the parties only referred to the issue in passing. *See* Brief of *Terrace* Appellant, 2012 WL 4340983, at *52-53 (devoting only a few sentences to this issue); Brief of *Terrace* Appellee, 2012 WL 5493156, at *68–69 (same); Reply Brief of *Terrace* Appellant, 2012 WL 6018880, at *19–20 (same). Instead, Terrace argued that it should not have to indemnify RFC for all of the expenses incurred in bringing this action because RFC pursued legal theories that ultimately did not prove decisive in this Court's grant of summary judgment to **\*840** RFC. *See* Brief of *Terrace* Appellant at *7–9, *52–53. RFC responded that it could pursue its claims "using multiple strategies," and was thus entitled to all of its attorneys' fees because they were "directly related to RFC's enforcement of its contractual rights against Terrace." Brief of *Terrace* Appellee at *68–69. The Eighth Circuit then ruled that RFC was entitled to all of its fees and costs, using the language quoted above. But because the parties did not discuss the public policy arguments presented by HLC here, the Eighth Circuit did not have an opportunity to address them.

EXHIBIT 10 - MOHRMAN DECLARATION

Indeed, the Court finds that ResCap's literal reading of *Terrace* potentially clashes with important tenets of state contract law. Although the principle of freedom of contract is accorded the utmost respect by Minnesota courts, the Minnesota Supreme Court has stated that this freedom must give way "when the particular contract violates some principle which is of even greater importance to the general public." *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 545 (Minn. 2014) (quoting *Rossman v. 740 River Drive*, 308 Minn. 134, 241 N.W.2d 91, 92 (1976)). Here, the Court finds that public policy augurs in favor of considering the reasonableness of this fee request. *See, e.g.,* *Campbell v. Worman*, 58 Minn. 561, 60 N.W. 668, 669 (1894) (holding, in a somewhat different contractual context, that courts should consider the "reasonableness" of a fees request, even in the absence of specific contractual language, as a way to "prevent injustice and unconscionable extortion"); *see also* *United Prairie Bank-Mountain Lake v. Haugen Nutrition & Equip., LLC*, 813 N.W.2d 49, 61 (Minn. 2012) (citing *Campbell* in passing for notion that, "in awarding attorney fees, courts should arrive at a fair and reasonable fee, and award a reasonable and just amount"). In fact, one Minnesota Court of Appeals panel has even directly held that "courts read a reasonableness requirement into" a contract that provides for recovery of "all legal fees." *Surgical Principals, Inc. v. Minn. Med. Dev., Inc.*, No. A13-0694, 2014 WL 1660662, at *4 (Minn. Ct. App. Apr. 28, 2014). [16]

16    Admittedly, *Surgical Principals* was an unpublished decision that did not answer the precise question here; the plaintiff sought its legal fees through trial, despite not having prevailed on the claims remaining after summary judgment. However, the Court can still consider this decision, and other unpublished decisions cited herein, as evidence of how the Minnesota Supreme Court might treat an issue of state law. *See* *Grinnell Mut. Reinsurance Co. v. Schwieger*, 685 F.3d 697, 703 n.5 (8th Cir. 2012) (noting that even "unpublished" Minnesota state court of appeals decisions "can be of persuasive value" to a federal court sitting in diversity jurisdiction).

Moreover, arguably, ResCap's reading of *Terrace* (and the Client Guide) is potentially inconsistent with the covenant of good faith and fair dealing, which is implied into all contracts under Minnesota law. *See, e.g.,* *In re Hennepin Cty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 503–04 (Minn. 1995). And, applying Minnesota law, this Court has previously implied a reasonableness standard to a fee request arising from a contractual fee-shifting provision that did not contain a reasonableness limitation. *See* *I-Sys., Inc. v. Softwares, Inc.*, No. 02-cv-1951 (JRT/FLN), 2005 WL 1430323, at *14 (D. Minn. Mar. 7, 2005) (citing *State Bank of Cokato v. Ziehwein*, 510 N.W.2d 268, 270 (Minn. Ct. App. 1994) (stating that when a contract authorizes a party to recover attorneys' fees, the courts will enforce it as long as the fees are reasonable.).

EXHIBIT 10 - MOHRMAN DECLARATION

All told, the Court declines to accept ResCap's argument that either *Terrace* or the Client Guide bar the Court from considering the reasonableness of ResCap's fees and costs request at all.

**\*841** By the same token, however, the Client Guide is "a freely negotiated agreement between two sophisticated parties." *Terrace*, 725 F.3d at 917. And, under Minnesota law, "parties are generally free to allocate rights, duties, and risks." *Lyon Fin. Servs.*, 848 N.W.2d at 545. Indeed, when interpreting a contract written by parties as sophisticated as those here, the Minnesota Supreme Court noted that parties acting "with the assistance of experienced and able counsel" must be "held accountable for the product of their negotiations." *Metro. Sports Facilities Comm'n v. Gen. Mills, Inc.*, 470 N.W.2d 118, 125 (Minn. 1991). This is not a case where, for example, a sophisticated debt collector is trying to use an "all costs and fees" contractual provision to shift excessive expenses onto an unwitting consumer.

Further, other provisions of the Client Guide *do* expressly limit ResCap's recovery of attorneys' fees to only those that are "reasonable." (*See, e.g.*, Client Guide §§ A202(II), A210(A), A212 (concerning event-of-default and third-party litigation).) [17] If the parties were able to agree in other contractual provisions that RFC could only recover "reasonable"—but not necessarily all— attorneys' fees, surely they could have done so in the at-issue indemnification provision as well. *See Quade v. Secura Ins.*, 814 N.W.2d 703, 705 (Minn. 2012) (requiring courts to read certain contractual provisions "in the context of the entire contract") (citing *Emp'rs Mut. Liab. Ins. Co. of Wis. v. Eagles Lodge of Hallock, Minn.*, 282 Minn. 477, 165 N.W.2d 554, 556 (1969); *see also Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 525 (Minn. 1990) ("We construe a contract as a whole and attempt to harmonize all clauses of the contract.").

[17]    On the Court's count, the Client Guide uses the word "reasonable" or "reasonableness" on 33 different occasions.

In sum, it is not altogether clear whether the Court must review the reasonableness of ResCap's petition for fees and costs—based on a contractual fee-shifting provision that contains no mention of reasonableness. However, in light of public policy considerations, the Court will conduct a review for reasonableness, although the Court is mindful that this is not a case in which the parties negotiated a "reasonableness" requirement into their indemnification agreement. In any event, as discussed below, the Court finds that with some modification, Plaintiff's petition for fees and costs is generally reasonable.

## B. Whether ResCap's Attorneys' Fees Are Reasonable

## EXHIBIT 10 - MOHRMAN DECLARATION

The amount of an attorney's fee award must be determined on the facts of each case and is within the district court's discretion. *Hensley v. Eckerhart*, 461 U.S. 424, 429, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *see Hanig v. Lee*, 415 F.3d 822, 825 (8th Cir. 2005) (citation omitted) ("Attorney's fees are within the broad discretion of the district court ...."). The starting point for determining a reasonable attorneys' fee is the " 'lodestar' " calculation, which is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.[18] *Hanig*, 415 F.3d at 825 (citation omitted); *see Hensley*, 461 U.S. at 433, 103 S.Ct. 1933. The fee applicant bears the burden of demonstrating that the fee rates are reasonable. *Hensley*, 461 U.S. at 433, 103 S.Ct. 1933. Courts consider "all relevant circumstances" when determining **\*842** the reasonableness of hours and hourly rates. *Milner v. Farmers Ins. Exch.*, 748 N.W.2d 608, 621 (Minn. 2008) (citing *State v. Paulson*, 290 Minn. 371, 188 N.W.2d 424, 426 (1971)). Factors relevant to the determination of reasonableness include:

> (1) the time and labor required; (2) the nature and difficulty of the responsibility assumed; (3) the amount involved and the results obtained; (4) the fees customarily charged for similar legal services; (5) the experience, reputation, and ability of counsel; and (6) the fee arrangement existing between counsel and the client.

*Id.* Federal courts consider the same or similar factors[19] when determining whether to adjust the loadstar amount upward or downward, although "many of these factors usually are subsumed within the initial [lodestar] calculation." *Hensley*, 461 U.S. at 434 n.9, 103 S.Ct. 1933.

[18]  Although the Supreme Court applied the lodestar methodology in *Hensley* to a statutory fee-shifting petition, courts have also applied it in cases involving contractual fee provisions. *See Best Buy Stores, L.P. v. Developers Diversified Realty Corp.*, No. 05-cv-2310 (DSD/JJG), 2011 WL 1321387, at \*3–4 (D. Minn. Apr. 4, 2011).)

[19]  These factors include:
> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

EXHIBIT 10 - MOHRMAN DECLARATION

*Hensley*, 461 U.S. at 429–30 n.3, 103 S.Ct. 1933 (citing *Johnson v. Ga. Hwy. Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).

However, in determining the lodestar, courts "need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838, 131 S.Ct. 2205, 180 L.Ed.2d 45 (2011). Courts "may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *Id.* But "[t]he determination of fees 'should not result in a second major litigation.' " *Id.* (quoting *Hensley*, 461 U.S. at 437, 103 S.Ct. 1933).

Here, Plaintiffs seek to recover $18,370,135.55 in attorneys' fees, plus a contingency payment to Quinn Emanuel of $[redacted].[20] (First Supp'l Horner Decl., Ex. 59 (Rev'd Fee & Cost Summ.).) The fee total reflects more than 33,074 direct hours of Quinn Emanuel time, 11,163.6 hours of Felhaber time, and 2,462.9 hours of Carpenter Lipps time.[21] (*See* Horner Decl. ¶¶ 22, 26, 31.) In addition, Plaintiff seeks an award of costs in the amount of $5,078,519.47.[22] (*See* First Supp'l Horner **\*843** Decl., Ex. 59 (Rev'd Fee & Cost Summ.).) Included in Plaintiff's total revised request are $465,706.29 in fees incurred in bringing their fee requests before this Court.[23] (First Supp'l Horner Decl. ¶¶ 4, 7.)

[20] The fees total, $18,370,135.55, consists of the following total amounts charged to HLC, per law firm: $13,849,850.18 (Quinn Emanuel) + $3,459,311.29 (Felhaber) + $972,274.13 (CLL) + $88,699.95 (Spencer Fane). (First Supp'l Horner Decl., Ex. 59 (Rev'd Fee & Cost Summ.).)

[21] ResCap provided these hourly totals in the initial Horner Declaration. (Horner Decl. ¶¶ 22, 26, 31.) Subsequently, it eliminated billing entries for 17 Quinn Emanuel timekeepers for the July to November 2018 period, reducing its earlier estimate by $17, 927.50, and for a Carpenter Lipps timekeeper for the same period, reducing the total by $135. (*See* First Supp'l Horner Decl. ¶ 3.) However, it also added billing entries for work performed between December 1, 2018 and January 30, 2019 related to Plaintiff's prejudgment interest motion, the fee motion, case administration, and sealing of confidential documents, totaling $465,706.29. (*Id.* ¶¶ 4, 7.) Given the net increase in its overall request, the total number of hours expended appears to be slightly higher than its original calculation.

[22] This total consists of $2,988,483.18 in fees for experts and support firms + $226,057.09 in document vendor fees + $1,863,979.20 in trial witness and vendor fees. (First Supp'l Horner Decl., Ex. 59 (Rev'd Cost & Fee Summ.).)

## EXHIBIT 10 - MOHRMAN DECLARATION

23    The December 1, 2018 to January 30, 2019 total of fees, $465,706.29, consists of $260,758 (Quinn Emanuel) + $112,361.84 (Felhaber) + $3,886.50 (CLL) + $88,699.95 (Spencer Fane). (First Supp'l Horner Decl. ¶¶ 4, 8–11.)

In preparing the fee petition, Plaintiff identified the fees and costs related to the HLC action, which consisted of both direct and indirect fees and costs. (Horner Decl. ¶ 7.) As Plaintiff explains, the direct fees and costs concerned work related directly to the HLC case, such as offensive depositions of HLC witnesses, reunderwriting and analysis of HLC loans, and work related to the HLC trial. (*Id.* ¶ 8.) Indirect fees and costs were related to work applicable to multiple cases, including HLC, such as defensive depositions of RFC witnesses, work on the global sample, expert work related to the reasonableness of the bankruptcy settlements prior to the HLC trial, summary judgment and *Daubert* work in the consolidated actions, and work associated with meeting and conferring with the joint defense group. (*Id.* at ¶¶ 9, 11.) ResCap has thoroughly documented its methodology, (*see id.* at ¶¶ 5, 17), and HLC does not appear to contest this aspect of Plaintiff's petition.

### 1. Supporting Evidence

In support of its motion, Plaintiff has submitted summaries of monthly invoices for approximately 30 professionals and witnesses, describing their work, in either redacted or unredacted form. (*See* Stephens Decl. ¶¶ 2–3.) In addition, it has provided unredacted invoices to the Court for *in camera* review. (*Id.* ¶ 3.) Further, ResCap has filed several declarations from its attorneys regarding their work and the billing records. (*See generally* Nesser Decl. [Doc. No. 4856], Horner Decl. [Doc. No. 4857], First Supp'l Horner Decl. [Doc. No. 5002], Heeman Decl. [Doc. No. 5010]; Stephens Decl. [Doc. No. 5011].)

### a. Justice Hanson's Opinion

As noted, in HLC's opposition, it offers the expert opinion of Justice Hanson, whom it retained in late January 2019. HLC points out that in contrast, ResCap offers no expert "willing to opine" on the reasonableness of its fee request. (Def.'s Opp'n at 11–12.) As to HLC's criticism, the Court has observed that "[f]requently, when moving for or opposing a fee petition, parties submit affidavits from local practitioners who opine on the reasonableness of attorneys' hourly rates, billing for legal services, and attorneys' standing and reputation in the local legal community." *Harris v. Chipotle Mexican Grill, Inc.*, No. 13-CV-1719 (SRN/SER), 2018 WL 617972, at *6 (D. Minn. Jan. 29, 2018). But the Court is unaware of a rule that *requires* a party to obtain such an opinion. *See id.* Moreover, "courts may draw on their own experience and knowledge of prevailing market rates." *Warnock v. Archer*, 397 F.3d 1024, 1027 (8th Cir. 2005); *see also Blackhurst v. Johnson*, 72 F.2d

**EXHIBIT 10 - MOHRMAN DECLARATION**

644, 648 (8th Cir. 1934) (finding expert evidence unnecessary because the "judge ... is himself an expert as to what are reasonable attorney fees.").

On ResCap's part, it urges the Court to exclude Justice Hanson's opinion altogether. It argues that Justice Hanson's opinion does not meet the standard necessary for the admission of expert opinion because: (1) his opinions are not sufficiently related to the facts so as to assist the factfinder; (2) his opinions are not reliable or trustworthy in an evidentiary sense, since HLC provided him with only a smattering of documents on which to base his **\*844** opinion; and (3) despite his qualifications as an attorney, he lacks the necessary expertise to opine on the reasonableness of fees in this case. (Pl.'s Reply at 8–11.)

The Court declines to exclude Justice Hanson's opinion, but does not give it significant weight. Without question, Justice Hanson is a highly respected and experienced jurist in Minnesota. Plaintiff itself recognizes that he is a qualified attorney. (*Id.* at 10.) However, through no fault of Justice Hanson, defense counsel inadequately prepared him about numerous aspects of this case, including central issues that consumed substantial amounts of attorney time. For example, he did not consider the extent to which Plaintiff's breach of contract claim overlapped with its indemnification claim, (Stephens Decl., Ex. 65 (Hanson Dep.) at 138–41)), nor was he aware that at trial, Plaintiff was required to establish the reasonableness of the underlying bankruptcy settlements. (*Id.* at 80–81.)

Of the thousands of documents filed on this docket, defense counsel provided Justice Hanson with a mere 21 court submissions, only ten of which were from the July to November 2018 period on which HLC bases much of its objections. (*Id.* at 86–87, 92–93).) Among the documents that defense counsel did not provide were the complete trial transcript, *Daubert* filings, bankruptcy filings, witness and exhibit lists, and deposition designations. (*Id.* at 30–31, 97, 101–03, 105, 111–12, 158.) While Justice Hanson compared the number of trial witnesses as between ResCap and HLC, finding ResCap's number "too high," defense counsel did not provide him with the full trial transcripts so that he might review their testimony and consider how each side used their witnesses—critical, substantive information that would inform any meaningful analysis of the numerical differences. (*Id.* at 184.) Nor did Justice Hanson know that ResCap sought the same damages under both its breach of contract and indemnification claims. (*Id.* at 136–37, 141.) Also, Justice Hanson did not analyze the amounts at issue in the cases that ResCap ultimately settled with other defendants in this consolidated action. (*Id.* at 205.) In this regard, he did not evaluate the risks facing ResCap if it were to lose the HLC trial. (*Id.*) While his opinion may nonetheless be of some value to the Court, its weight will be qualified by the limitations in preparation and resources that HLC provided him.

Beginning his work only in late January, it would be difficult for even an experienced attorney such as Justice Hanson to grasp the magnitude and complexity of this case—a case that by that time

EXHIBIT 10 - MOHRMAN DECLARATION

had amassed nearly 5,000 docket entries, lasted over four years, involved hundreds of depositions, and Plaintiff's document production of 3,000,000 documents (nearly 24,000,000 pages), plus 9,000 additional documents exclusive to HLC. (*See* Nesser Decl. ¶ 7.) Given the express fee-shifting provisions in the Client Guide, HLC had always been aware of the prospect of an award of attorneys' fees. Moreover, given HLC's own billings and involvement in this aggressively contested litigation, HLC should have reasonably anticipated that Plaintiff's fee request would be substantial. While the specific amount may not have been known until ResCap filed the instant motion, HLC certainly could have begun the work of preparing an expert well in advance of January 2019.[24] Instead, HLC prepared Justice Hanson with too little information, too late, approaching him a few days before January 28, 2019 to discuss **\*845** his potential engagement, (Stephens Decl., Ex. 65 (Hanson Dep.) at 86–87, 92–93)), and giving him little more than two weeks to formulate his opinion. Indeed, Justice Hanson acknowledged that he formulated his opinion after only approximately 40 hours of analysis, with all of the data analysis performed by HLC's counsel. (*Id.* at 86–87, 92–93.)

[24]    ResCap observes that the parties met and conferred about Plaintiff's fee motion as early as December 11, 2018, and Plaintiff filed its motion on January 4, 2019. (Pl.'s Mem. at 9 n.3.)

Consistent with the law, Justice Hanson defers to the Court's expertise, acknowledging that the undersigned judge is in a best position to assess the reasonableness of the fee request, (*id.* at 110), and the complexity of the damages model. (*Id.* at 126); *see also 650 N. Main Ass'n v. Frauenshuh, Inc.*, 885 N.W.2d 478, 494 (Minn. Ct. App. 2016) ("Because the district court is the most "familiar with all aspects of the action from its inception through post trial motions," it is in the best position to evaluate the reasonableness of requested attorney fees.") (citing *Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 629 (Minn. 1988)). The undersigned judge shepherded the parties through more than four years of litigation, over the course of 38 monthly status conferences. These monthly conferences involved frequent motion practice, in addition to motions on summary judgment, *Daubert*, and motions in limine. The undersigned presided over a 16-day jury trial,[25] which included multiple motions for judgment as a matter of law and numerous evidentiary rulings. Post-trial, the Court entertained Plaintiff's motion for prejudgment interest, in addition to the instant motion. Furthermore, the undersigned is well acquainted with the local billing market.[26] For all of these reasons, while the Court will not exclude Justice Hanson's opinion, it will primarily rely on its own in-depth knowledge of the case to assess the reasonableness of ResCap's fee request.

[25]    Although the case proceeded for 17 days, the final day involved only jury deliberations and the verdict.

[26]    The undersigned has served as a federal magistrate judge and district judge for nearly 19 years, and practiced law in the Twin Cities for 16 years prior to judicial service. As a partner

EXHIBIT 10 - MOHRMAN DECLARATION

in a complex litigation practice in the Twin Cities, the undersigned prepared fee petitions and regularly reviewed billing records, and as a judge, has addressed numerous petitions for attorneys' fees, nearly all of which have involved billing rates for the Twin Cities legal market.

### b. Redacted Invoices

Given that counsel for both parties remain actively involved—and actively adverse—in the Second Wave litigation, Plaintiff redacted portions of its billing statements on grounds of attorney-client privilege and work product. ResCap provided unredacted copies for the Court's *in camera* review, which the Court compared against the redacted entries. Under these circumstances, the redactions were proper, and the full billing entries need not be disclosed. *See United States v. Petters*, No. 08-cv-5348 (ADM/JSM), 2009 WL 1922320, at *2 (D. Minn. June 30, 2009) (finding, in case involving *in camera* review of billing statements, that disclosure of billing statements was not required due to burdensomeness and "risk of inadvertently disclosing confidential and protected information" while related criminal proceedings were ongoing); *Bruckelmyer v. Ground Heaters, Inc.*, No. 02-cv-1761 (DWF/RLE), 2003 WL 21524741, at *3 (D. Minn. June 5, 2003) (noting that "in recognition of the privileged status of the time entries of Plaintiff's counsel, the time sheets involved were not disclosed to the Defendants," who had an opportunity to review the total fees and costs requested).

While HLC claims that the redactions hindered its ability to properly challenge the billing records, (*see* Def.'s Opp'n at 24), the Court disagrees. For instance, HLC's **\*846** argument as to excessive billing focuses solely on the period from July to November 2018. (*Id.* at 18 n.6.) HLC is well familiar with that period of pre-trial and trial and, in consultation with the docket, it can sufficiently glean the activities for which Plaintiff's counsel billed. Moreover, HLC has submitted a detailed, lengthy opposition memoranda that attacks Plaintiff's fee petition on numerous grounds.

While Plaintiff asked the Court to require the production of HLC's invoices for the same period, the Court deferred ruling on that request until it had reviewed the parties' submissions on the instant motion. Having done so, the Court finds it unnecessary to review HLC's billing records. As the Court will discuss below, given the substantially different legal burdens and litigation strategies, and the Court's own familiarity with the facts and procedure of this case, a comparison of the two sides' billing records would not be a particularly informative exercise.

### 2. Hourly Rates

### EXHIBIT 10 - MOHRMAN DECLARATION

Again, the Court examines the plaintiff's hourly billing rates when determining the proper lodestar. *Hanig*, 415 F.3d at 825. The hourly rates for Plaintiff's counsel are as follows: (1) Quinn Emanuel's work reflects a [redacted] discount, with discounted hourly rates ranging from $87.50 to $212.50 for paralegal and litigation support, and from $160 to $675 for attorneys, (Horner Decl. ¶22); (2) Felhaber's hourly rates ranged from $130 to $210 for paralegal and litigation support, and from $85 to $440 for attorneys, (*id.* at ¶ 29); (3) Carpenter Lipps' hourly rates ranged from $100 to $130 for paralegal and litigation support, and from $175 to $415 for attorney time, (*id.* ¶ 32); and (4) Spencer Fane's hourly rates ranged from $145 to $500 for all timekeepers. (*See id.*, Ex. 64 (Spencer Fane Invoices).) And as previously noted, for work performed by Quinn Emanuel, Plaintiff also seeks a contingency payment of $[redacted]. (First Supp'l Horner Decl., Ex. 59 (Rev'd Fee & Cost Summ.).)

Generally, to determine whether an hourly rate is reasonable, courts look at the rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *accord* *McDonald v. Armontrout*, 860 F.2d 1456, 1458–59 (8th Cir. 1988). Sometimes, where particular legal specialization is required, courts may consider a national billing rate. *Casey v. City of Cabool*, 12 F.3d 799, 805 (8th Cir. 1993). As noted earlier, the fee applicant bears the burden of producing evidence to support the rates charged. *Hensley*, 461 U.S. at 433, 103 S.Ct. 1933.

### a. Quinn Emanuel

As noted, Quinn Emanuel billed at a [redacted] reduced hourly rate of $87.50 to $212.50 for paralegal and litigation support, and $160 to $675 for attorney time, in exchange for an [redacted] contingency payment on any "Recovery." (Horner Decl. ¶ 73.) In their representation agreement, ResCap and Quinn Emanuel defined "Recovery" as "[redacted]" (*Id.*)

HLC's expert, Justice Hanson, opines that Quinn Emanuel's discounted hourly rates are "at the high end of, if not above, the Minneapolis market." (Hanson Decl. at 9.) He states that in 2018, billing rates for paralegals at firms headquartered in Minneapolis and other midsized firms "ranged from $181 at the 25th percentile to $214 at the 75th percentile; all attorney rates ranged from $301 at the 25th percentile to $411 at the 75th percentile; and senior attorney rates (partners with over 20 years' experience) ranged from $395 at the 25th percentile to $576 at the 75th percentile." (*Id.* at 9–10.) He further opines that while some senior attorneys in the Minneapolis **\*847** legal market bill at hourly rates in excess of $576, in his opinion, "the highest reasonable rate would not be over $700." (*Id.* at 9.) HLC seeks to exclude the contingency payment of $[redacted] from any award of fees. (Def.'s Opp'n at 29–30.)

## EXHIBIT 10 - MOHRMAN DECLARATION

Plaintiff, however, cites authority in which Minnesota courts have granted fee awards to attorneys billing at hourly rates as high as $650. (Pl.'s Mem. at 23) (citing *Fancher v. Klann*, No. 13-cv-435 (DSD/JJK), 2015 WL 1810235, at *2 (D. Minn. Apr. 21, 2015) (approving hourly rates ranging from $225 to $650 for attorneys and $125 for paralegals); *Owner-Operator Indep. Drivers Ass'n, Inc. v. Supervalu, Inc.*, No. 05-cv-2809 (JRT/JJG), 2012 WL 6760098, at *7 (D. Minn. Sept. 30, 2012) (noting that rates of $600 for senior, experienced attorneys have been approved by Minnesota courts); *Madison v. Willis*, No. 09-cv-930 (DWF/AJB), 2011 WL 851479, at *1 (D. Minn. Mar. 9, 2011) (finding hourly rates of $180 to $600 for attorneys, and $100 to $125 for paralegals to be reasonable)); *see also Safelite Grp., Inc. v. Rothman*, No. 15-cv-1878 (SRN/KMM), 2017 WL 3495768, at *7 (D. Minn. Aug. 11, 2017) (finding reasonable hourly rates of $370 to $560 for work performed from 2015 to 2017), *aff'd*, 759 Fed. App'x 533 (8th Cir. 2019); *North Dakota v. Heydinger*, No. 11-cv-3232 (SRN/SER), 2016 WL 5661926, at *16–17 (D. Minn. Sept. 29, 2016) (approving hourly rates of $120 to $515 for attorneys and $120 to $210 for paralegals and support staff for work from 2011 to 2015), *aff'd*, *North Dakota v. Lange*, 900 F.3d 565 (8th Cir. 2018). ResCap asserts that if Quinn Emanuel had charged its full rates, plus a contingency fee, the fees would have been $[redacted] higher. (Pl.'s Mem. at 23.)

Plaintiff states that in *Zebeck v. Metris Cos., Inc.*, No. A07-0756, 2008 WL 2168333, at *7 (Minn. Ct. App. May 27, 2008), the plaintiff received an award of attorneys' fees in the full amount owed to his attorneys pursuant to a contingency fee agreement, even though the lodestar calculation was approximately $10 million less. (Pl.'s Mem. at 12.) The defendant sought to reduce the award, arguing that the attorneys' fees should be limited to the hourly fees actually earned, using the lodestar methodology. *Zebeck*, 2008 WL 2168333, at *2. In rejecting defendant's argument, the Minnesota Court of Appeals explained, "Zebeck did not agree to compensate the attorneys by an hourly rate; he agreed to a contingency fee, and his attorneys ran the risk of not being compensated if his lawsuit was not successful." *Id.* at *7. "While Minnesota law provides an alternative method of calculating attorney fees, it does not prohibit contingency fees." *Id.*

*Zebeck*, however, was an employment law case, in which plaintiff's counsel worked solely on a contingency-fee basis, obtaining no hourly payments whatsoever. *Id.* at *2. In contrast, the arrangement here was a hybrid, with both hourly rates and the potential for a bonus. HLC, however, argues that the contingency bonus should be factored into the hourly rate calculation, resulting in a higher "effective" hourly rate for Quinn Emanuel attorneys. (Def.'s Opp'n at 27–28.) Folding the contingency bonus into the hourly rate calculation results in hourly rates of $122.50 to $297.50 for paralegals and litigation support, and $224 to $945 for attorneys. (*Id.* at 27.)

The Minnesota Court of Appeals has considered an hourly billing/contingency hybrid fee arrangement, and advises that courts are to first determine the initial lodestar amount by considering the reasonableness of the rate and whether the hours were reasonably expended,

<span style="color:red">EXHIBIT 10 - MOHRMAN DECLARATION</span>

and then consider the contingency enhancement if some other factor or exceptional circumstance warrants it. **\*848** *Comm'r of Transp. v. Krause*, No. A17-1362, 2018 WL 2187043, at \*3 (Minn. Ct. App. May 14, 2018). While *Krause* is an unpublished decision, it provides persuasive guidance. *See Grinnell Mut. Reinsurance Co.*, 685 F.3d at 703 n.5. Moreover, although *Hensley* did not involve a hybrid fee arrangement, it notes that among the factors to be considered for a fee award adjustment, after calculating the loadstar, is whether the fee is fixed or contingent. 461 U.S. at 429–30 n.3, 103 S.Ct. 1933. The Court will therefore address the contingency enhancement separately, after calculating the lodestar.

The Court finds that Quinn Emanuel's reduced hourly billing rates, considered separately from the contingency payment, are reasonable. The reduced paralegal and litigation support hourly rates of $87.50 to $212.50, although at the upper end of Justice Hanson's Minneapolis 2018 market data, nevertheless fall within the Twin Cities market range of hourly billing rates. While Quinn Emanuel's attorney hourly rates of $160 to $675, discounted, slightly exceed Justice Hanson's experience-driven market range of $301 to $576, they are still below the $700 hourly rate that he identifies as the outer limit of reasonableness for a senior attorney's time. And particularly given Quinn Emanuel's RMBS and bankruptcy expertise,[27] the Court finds Quinn Emanuel's reduced rates are reasonable. Moreover, as Plaintiff has noted, courts in Minnesota have awarded attorney's fees at hourly rates of $600 and $650.[28] *Fancher*, 2015 WL 1810235, at \*2; *Owner-Operator Indep. Drivers Ass'n*, 2012 WL 6760098, at \*7; *Madison v. Willis*, 2011 WL 851479, at \*1.

[27]    Local counsel from Felhaber notes that it was difficult to locate co-counsel with the requisite expertise and lack of a conflict of interest. (Heeman Decl. ¶ 9.)

[28]    Furthermore, while a comparison of the hours expended by Rescap's counsel versus HLC's counsel is not particularly useful, as discussed more fully below, even HLC's expert concedes that HLC's attorneys billed at higher hourly rates than the reduced hourly rates for Quinn Emanuel attorneys and litigation support staff. (Hanson Decl. at 9.) As a specific example, HLC balks at Quinn Emanuel's discounted hourly rates, including a rate of $555 for one of the lead trial partners. But two of Williams & Connolly's trial counsel *associates* billed at rates of $646 per hour. (Stephens Decl. ¶ 21.) Ultimately, however, these observations do not factor into the Court's analysis, as Williams & Connolly's Washington, D.C. office is not in the Twin Cities legal market, nor is it seeking attorney's fees. If the Court were inclined to compare them, however, these hourly rates would provide a more relevant gauge of "reasonableness" than the billable hours that HLC urges the Court compare.

### b. "Inefficient Staffing" by Quinn Emanuel and Carpenter Lipps

EXHIBIT 10 - MOHRMAN DECLARATION

HLC also argues that due to "inefficient staffing" by counsel from Quinn Emanuel and Carpenter Lipps between July to November 2018, the Court should reduce the average billing rates used by those firms during that time. (Def.'s Opp'n at 31.) HLC advocates for a reduction in average hourly billing rates for Quinn Emanuel and Carpenter Lipps from $343.84 and $320.83, respectively, to $300 per hour for both firms. (*Id.*) Alternatively, HLC urges the Court to apply Felhaber's average hourly rate of $235 to all three firms during this period.

The Court declines to reduce the hourly rates charged by Quinn Emanuel and Carpenter Lipps for the period of July to November 2018. These firms' hourly billing rates themselves, while high, are not excessive and fall comfortably within the Twin Cities market range. In the Court's consideration of the *Milner*/*Hensley* factors, it will address whether a reduction in billed *hours* is warranted for inefficient or **\*849** redundant staffing, but it will not reduce the hourly *rates* on this basis.

### 3. Reasonable Hours

The Court next considers whether the expenditure of billed hours was reasonable. HLC argues that the expenditure of hours by ResCap's counsel between July to November 2018 was excessive.[29] (Def.'s Opp'n at 15–26.) It contends that Plaintiff's hours billed during this period comprise 65% of the total hours that Plaintiff's firms billed during the course of this litigation. (*Id.* at 18.) As noted, HLC argues that this was a relatively straightforward case at that time, as the summary judgment ruling had "substantially narrowed the issues for trial." (*Id.*) Also, HLC contends that by then, this was an individual contract dispute between a single plaintiff and a single defendant. (*Id.* at 19.) It compares its own 12,300 billed hours to the 36,400 hours that Rescap's attorneys billed, arguing that for this pre-trial and trial period, the attorneys were essentially performing the same tasks. (*Id.* at 21.)

[29]     HLC does not challenge the excessiveness of hours expended by Plaintiff's counsel for other periods of this litigation, although it objects on other grounds. (Def.'s Opp'n at 18 n.6.)

Specifically, HLC argues that Plaintiff's fees must be reduced by: (1) substituting the hours expended by Williams & Connolly and Zelle during the five-month period for the hours expended by Quinn Emanuel and Felhaber; and (2) omitting the hours billed by Carpenter Lipps, as HLC contends that ResCap has failed to justify the need for this third firm. (*Id.* at 26.) HLC contends that these reductions would lower the hourly fee component of Plaintiff's petition by over $7 million.

### a. Scope of Litigation

## EXHIBIT 10 - MOHRMAN DECLARATION

The Court disagrees with HLC about the extent to which the summary judgment ruling narrowed the issues for trial. As discussed at the outset of this opinion, while summary judgment resolved some issues, significant issues remained, such as: (1) whether the Client Guide applied to the at-issue loans through contract formation or equitable estoppel, *see In re ResCap*, 332 F. Supp. 3d at 1118 n.5, 1175; (2) whether ResCap's remaining damages model provided a "reasonably certain" means by which to allocate damages, *id.* at 1203–04; (3) whether the underlying bankruptcy settlements were reasonable, *id.* at 1157; and (4) whether the question of reasonableness would be resolved by a jury or through a separate bench trial. *See In re ResCap*, 2018 WL 4469249. In addition, outstanding issues of fact remained concerning causation and allocation. *See In re ResCap*, 332 F. Supp. 3d at 1168–69. Throughout, Plaintiff bore the burden of proof. For example, it was its burden to prove that Client Guide breaches contributed to claims for breaches of separate contracts by 506 trusts and 109 monoline insurers in RFC's bankruptcy. (Pl.'s Reply at 11) (citing Stephens Decl., Ex. 65 (Hanson Dep.) at 128–29.) Moreover, to provide the jury with context, ResCap needed to explain the general workings of the RMBS industry, as well as the historical background in which RFC's bankruptcy arose. These were are all significant, difficult issues of law and fact. Complicating matters, HLC repeatedly challenged the impact of the summary judgment ruling, seeking "clarification," on certain issues, such as categories of evidence, sole responsibility evidence, ResCap's sample sizes, and the estoppel and waiver defense. (*See* Stephens Decl. ¶¶ 7–11.) In short, HLC's description of the case as "significantly less complicated" following summary judgment is simply not accurate.

And apart from the impact of the summary judgment order on the issues remaining **\*850** for trial, HLC states that this case "has *always* been a single-plaintiff, single-defendant contract dispute." (*See* Def.'s Opp'n at 14) (emphasis added). To HLC, it may have been a "single-plaintiff, single-defendant contract dispute," in which it could always focus on its own case. But to characterize this case so narrowly ignores years worth of context. This case was never so limited for ResCap, which had, at one time, as many as 67 first-wave defendants to simultaneously litigate against. Throughout this opinion, the Court has attempted to recount four years of broad discovery, non-stop motion practice, and a 16-day jury trial in a "very, very complicated," (Trial Tr. at 857), and contentious case, stemming from "the most legally and factually complicated case" that the bankruptcy judge had overseen. (Dec. 11, 2013 Hr'g Tr. Excerpts at 43-44.) Again, HLC vastly oversimplifies the time-consuming, difficult nature of this litigation.

It is not unexpected that ResCap would expend the largest percentage of its billed time in the five-month period of the HLC trial preparation and trial, given that ResCap allocated its resources across multiple cases. Even during the July to November 2018 period, ResCap was still preparing to go to trial with several other defendants, with the next trial in the queue scheduled for February 2019. Moreover, given that ResCap was still litigating against these other defendants, the HLC trial functioned as a "bellwether," making its outcome all the more important to ResCap. That

EXHIBIT 10 - MOHRMAN DECLARATION

HLC's trial served as a de facto bellwether is borne out by the fact that the remaining defendants all settled within two months of the HLC trial.

For these reasons, the Court rejects HLC's characterization of this case in general, and specifically rejects its characterization as the basis for a reduction in attorneys' fees.

### b. "Unprecedented" Award

HLC argues that an award of over $28.3 million in attorney's fees and costs would be unprecedented in Minnesota, and asserts that Plaintiff's request "approach[es] 99% of its recovery ($28.3 million ÷ 28.7 million)." (Def.'s Opp'n at 2, 13–15.)

First, the Court must correct HLC's arithmetic. By using the wrong denominator, it underestimates Plaintiff's damages award, skewing it to HLC's advantage. Importantly, HLC's denominator does not include the award of $14,066,931.50 in preverdict prejudgment interest. [30] Preverdict interest is "not conventional 'interest,' " but rather, "it is an element of damages awarded to provide full compensation by converting time-of-demand ... damages into time-of-verdict damages." *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 401 F.3d 901, 918 (8th Cir. 2005) (citing *Lienhard v. State*, 431 N.W.2d 861, 865 (Minn. 1988)).

[30]   Granted, the Court issued the order awarding prejudgment interest after HLC filed its opposition to the instant motion. However, Justice Hanson testified that he did not consider the effect of prejudgment interest on the total damages award *at all*, stating, "I understand that's an issue that's being debated, but I've not been asked to look into that." (Stephens Decl., Ex. 65 (Hanson Dep.) at 198.)

At oral argument on the instant motion, counsel for HLC argued that consideration of the preverdict prejudgment interest award should not be part of the calculation, stating, "The analysis focuses on the comparison of the fees and costs to the damages." (Feb. 21, 2019 Hr'g Tr. at 55 [Doc. No. 5031] ) (citing *Asp v. O'Brien*, 277 N.W.2d 382, 385 (Minn. 1979)). The Court disagrees. Because preverdict prejudgment interest *is* part of the damages, *see* *Lienhard*, 431 N.W.2d at 865, even under HLC's formulation of the "right **\*851** analysis," the amount of preverdict prejudgment should be included in the damages total. [31] Moreover, the authority on which HLC relies does not discuss the question of whether prejudgment interest is part of a damages award. *See* *Asp*, 277 N.W.2d at 385. Rather, in remanding an attorney's fee award, the court in *Asp* merely noted that the amount of the mechanic's lien that the Plaintiff had recovered ($4,359.46) was small as compared to the attorney's fees assessed ($2,400). *Id.* The plaintiff's recovery would have remained "small," even if the court had included the $377.47 in interest that the plaintiff

EXHIBIT 10 - MOHRMAN DECLARATION

received. *See* *id.* at 383. The same is not true here, as the addition of $14.1 million in preverdict prejudgment interest on a $28.7 million jury verdict is not "small." Thus, Plaintiff's award of prejudgment interest must be included in the damages total. Including that amount results in a recovery for ResCap of $42,766,931.50.

31  Postverdict interest, however, "is compensation for the loss of use of money as a result of the nonpayment of a liquidated sum, for which liability has already been determined, not compensation for the injury giving rise to liability." *Lienhard*, 431 N.W.2d at 865–66 (citing *McCormack v. Hankscraft Co., Inc.*, 281 Minn. 571, 161 N.W.2d 523, 524 (1968)). Therefore, the as-yet-to-be-determined amount of postverdict prejudgment interest appears to not factor into any proportionality analysis of fees and costs versus damages.

While the consideration of fee awards in similar cases is a *Hensley* factor that bears on reasonableness, 461 U.S. at 430 n.3, 103 S.Ct. 1933, this factor is not implicated where there are no other similar cases. ResCap's fee request may be "unprecedented" because this case was unprecedented. HLC asserts that there is no private contract case from Minnesota in which a Court has awarded attorney's fees and costs of an amount approaching $28.3 million. (Def.'s Opp'n at 13.) But as ResCap notes, "just because there is no comparable request does not mean that [Plaintiff's fee petition] is unreasonable; it just means there is no comparable case." (Pl.'s Reply at 11.)

HLC points to *Residential Funding Co. v. Terrace Mortgage*, 2012 WL 12903738, at *2, and *Windsor Craft Sales LLC v. VICEM Yat Sanayi ve Ticaret AS*, No. 10-cv-297 (ADM/JJG), 2012 WL 3776462, at *10 (D. Minn. Aug. 30, 2012), as examples of other "complex" contract cases "involving international businesses, sophisticated clients, and zealous attorney advocacy on both sides," but with significantly lower fee awards. (Def.'s Opp'n at 13.) It notes that in *Terrace Mortgage*, the Court awarded only $209,907 in fees and costs, and in *Windsor Craft*, it awarded only $1.57 million. (*Id.*) These cases, however, are quite factually distinct from the instant case, as HLC's own expert admitted. (*See* Stephens Decl., Ex. 65 (Hanson Dep.) at 191–96.) For instance, *Terrace Mortgage* involved only 13 at-issue loans in the context of repurchase, as opposed to the nearly 2,000 at-issue loans in the indemnification action here, and involved very different defenses. (*See id.* at 192–94.)

Just as this case involved extremely complicated legal issues, it always involved extremely high sums of money, originating, after all, from ResCap's efforts to indemnify itself for $9 *billion* in court-approved bankruptcy settlements. Here, after hard-fought, years-long litigation, the jury found HLC's share of liability was $28.7 million. It is not surprising that there are no comparisons in Minnesota. If anything, the sizeable amount of Plaintiff's recovery—apparently unique in Minnesota—lends support to its request for significant attorney's fees. Accordingly, the Court does

EXHIBIT 10 - MOHRMAN DECLARATION

not consider the "unprecedented" amount of ResCap's fee request as reason to reduce Plaintiff's award.

### *852  c. Amount Involved & Results Obtained

Among the factors for determining a reasonable lodestar and whether an adjustment to the lodestar is warranted, courts consider the overall amount involved in the litigation. *Hensley*, 461 U.S. at 434 n.9, 103 S.Ct. 1933; *Milner*, 748 N.W.2d at 621 (citing *Paulson*, 188 N.W.2d at 426). This factor is not dispositive. *Best Buy Stores, L.P. v. Developers Diversified Realty Corp.*, No. 05-cv-2310 (DSD/JJG), 2011 WL 1321387, at *4 (D. Minn. Apr. 4, 2011). Courts do not apply a "dollar value proportionality rule," but consider this factor, among many others, in assessing reasonableness. *Green v. BMW of N. Am., LLC*, 826 N.W.2d 530, 537 (Minn. 2013). And in particular, the Minnesota Supreme Court advises that the "amount involved" factor is not limited to the "prevailing party's percentage of success," but rather, should be considered in tandem with the results obtained. *Id.*

Thus, given these fact-specific considerations, a "court may find a fee award in excess of damages to be reasonable." *See Best Buy*, 2011 WL 1321387, at *4. While this may arise more commonly in civil rights litigation, where damages awards do not necessarily reflect the overall public benefit of the litigation, *see City of Riverside v. Rivera*, 477 U.S. 561, 575, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986), courts have also awarded fees exceeding damages in breach of contract actions. *See Northfield Care Ctr. v. Anderson*, 707 N.W.2d 731, 736 (Minn. Ct. App. 2006) (affirming award of $14,265 in attorneys' fees for recovery of $3,838.33 in contract damages). On the other hand, given different facts, courts have found fee requests that exceed that the results obtained to be unreasonable. *See Milner*, 748 N.W.2d at 620 (finding enhanced fee award of $1.8 million, on a $376,000 Minnesota Fair Labor Standards Act judgment inappropriate and not "reasonable in relation to the results obtained.").

As noted, HLC characterizes Plaintiff's motion as a request for $28.3 million in fees and costs, comparing it to the $28.7 million damages award, and describing it as an almost 1:1 request. (*See* Def.'s Opp'n at 1, 13.) It argues that this lack of proportionality merits a reduced award. (*Id.*)

As discussed earlier, HLC's comparison requires some correction. First, HLC lumps together fees and costs into an aggregate amount of $28.3 million. But the Court's focus in this section of the opinion is on attorneys' fees, for which Plaintiff seeks approximately $18.4 million, with a contingency fee bonus of approximately $[redacted]. Second, HLC's reference to the $28.7 million damages award does not include the award of preverdict prejudgment interest of $14.1 million, and the as-yet uncalculated award of postverdict prejudgment interest. In other words, Plaintiff

EXHIBIT 10 - MOHRMAN DECLARATION

is entitled to recover approximately $42.8 million. Thus, any analysis of the amount involved and the results obtained must start with accurate numbers: ResCap seeks fees of almost $18.4 million on a recovery of approximately $42.8 million, or, if the contingency bonus is included, it seeks fees of $[redacted] million on a recovery of approximately $42.8 million. Contrary to HLC's characterization, Plaintiff's fee request is far from a 1:1 proposition.

Along with the amount involved, the Court considers the results obtained. ⚐ *Green*, 826 N.W.2d at 537. HLC argues that ResCap achieved "limited success," therefore, any fee award should be reduced accordingly. Because the Court considers this one of the factors subsumed in the lodestar calculation, the Court addresses this argument in the context of the amount involved and results obtained.

HLC notes that ResCap initially asserted claims for both breach of contract and **\*853** indemnification, but, on summary judgment, the Court dismissed as time-barred ResCap's breach of contract claims for loans sold prior to May 14, 2006. (Def.'s Opp'n at 32) (citing Summ. J. Order at 145). HLC posits that as a result of the Court's ruling, ResCap "abandoned" its breach of contract claim altogether prior to trial and "completely failed." (*Id.*) In addition, HLC observes that on summary judgment, the Court rejected two of Plaintiff's three damages models—the "Breaching Loss Approach," which calculated $61 million in damages, and the "Allocated Loss Approach," which calculated $60 million in damages. (*See* Summ. J. Order at 162–63; Smallwood Decl., Ex. 15 (Add. to Corr. Snow Damages Rpt.) at App. G, Fig. 9.) Instead, the Court permitted Plaintiff to present its "Allocated Breaching Loss Approach," which calculated $44 million in damages. (*Id.*) Prior to trial, ResCap reduced its damages total under this methodology to $40.6 million, dropping its claim for bankruptcy-related fees and adjusting other elements. (Trial Tr. at 2098). HLC points to the excluded damages models as examples of Plaintiff's limited success, and asserts that ultimately, Plaintiff's damages award was "only $28.7 million in light of the flaws in its damages methodology." (Def.'s Opp'n at 33.) Further, HLC argues that it was only as the fact discovery deadline was approaching that ResCap began to pursue allocation theories under its indemnification claim, having spent much of its time pursuing "its unsuccessful breach-of-contract claim and its doomed 'Breaching Loss' theory." (*Id.*) In light of the "limited success," HLC urges the Court to reduce any award of attorney's fees by 25% to 50%. (Hanson Decl. at 15.)

The Court disagrees with HLC's characterization of the level of ResCap's success. Setting aside the multi-million-dollar jury verdict and prejudgment interest award for a moment, before trial, the Court ruled in ResCap's favor on numerous summary judgment issues, *Daubert* and *in limine* motions. During trial, the Court granted several of Plaintiff's motions for judgment as a matter of law. True, ResCap voluntarily dismissed its breach of contract claim. But its breach of contract claim and indemnification claim were closely related and involved overlapping forms of proof. *See* *I-Sys., Inc.*, 2005 WL 1430323, at *12 (rejecting argument that fee petitioner obtained only partial success, stating, "This is not a case in which unrelated claims were pursued, and plaintiff

<div align="center" style="color:red">EXHIBIT 10 - MOHRMAN DECLARATION</div>

prevailed only on one theory.") Moreover, the two claims were based on the same set of facts. And under those facts, ResCap prevailed on its indemnification claim. *Cf. Gumbhir v. Curators of the Univ. of Mo.*, 157 F.3d 1141, 1146–47 (8th Cir. 1998) (finding that *Gumbhir* represented an "extreme instance" warranting a fee reduction where only three of the plaintiff's nine claims survived summary judgment, and the retaliation claim on which the plaintiff solely prevailed "was not his major claim.") The vast majority of the work expended in pursuit of Plaintiff's breach of contract claim was likewise expended on the indemnification claim. *See Ewald v. Royal Norwegian Embassy*, No. 11-cv-2116 (SRN/SER), 2015 WL 1746375, at *13 (D. Minn. Apr. 13, 2015) ("Given the overlapping facts that supported all of [plaintiff's] claims, the overwhelming majority of her attorneys' time spent in investigation, pleading, discovery, and trial is time that would have been necessarily expended to prosecute her successful unequal pay claim.").

As to the damages models, although the jury did not award ResCap its requested $40.6 million in damages, and the Court precluded the use of two of its damages methodologies, its success is not "limited" merely because it failed to obtain all of its requested relief. *See Simpson v. Merchants & Planters Bank*, 441 F.3d 572, 580–81 (8th Cir. 2006) (rejecting defendant's argument that percentage of attorney's **\*854** fees awarded should reflect the percentage of relief obtained versus the relief sought); *Ewald*, 2015 WL 1746375, at *14 (finding that plaintiff's success was not "limited" merely because she did not receive all of her requested damages, or succeed on all of her claims)). ResCap's $28.7 million verdict is not inconsequential. It stands in contrast to HLC's highest proposed damages figure, which appears to have been approximately $4 million. (Stephens Decl. ¶ 14.) And, including prejudgment interest, Plaintiff's recovery of $42.8 million is substantial. Contrary to HLC's position, the Court finds that consideration of the amount involved and the results obtained supports Plaintiff's request for relief.

### d. Comparison With Hours Billed by Opposing Counsel

HLC also urges the Court to compare HLC's billing totals from July through November 2018 with those of Plaintiff's counsel in order to evaluate the reasonableness of Plaintiff's request. (Def.'s Opp'n at 20.) It argues that the comparison is apt because counsel on both sides possessed similar skill, reputation, and experience, both sides performed comparable pre-trial and trial tasks, and "to the extent the case was complicated," both sides were forced to contend with the complexities. (*Id.* at 20–21.)

As for specific differences between Quinn Emanuel's billable hours and Williams & Connolly's, HLC asserts that Quinn Emanuel billed approximately 26,200 hours, or more than double the roughly 12,300 hours that Williams & Connolly billed. [32] (*Id.* at 21) (citing Hanson Decl. at 13.) Furthermore, HLC criticizes Quinn Emanuel's complement of staff, asserting that its partners and

<span style="color:red">EXHIBIT 10 - MOHRMAN DECLARATION</span>

counsel billed over 3,000 hours more than the firm's associates (9,991 vs. 6,490). (*Id.* at 30) (citing Hanson Decl. at 7–8, 13).

32    HLC also argues that Plaintiff's counsel performed redundant or duplicative work and engaged in excessive interfirm and intrafirm communications. (*See* Def.'s Opp'n at 24–25.) The Court addresses these issues separately in the next section of this opinion.

While it may sometimes be useful to compare the hours billed by opposing counsel, the comparison is often irrelevant. *See Burks v. Siemens En. & Automation, Inc.*, 215 F.3d 880, 884 (8th Cir. 2000) (describing the relationship as an "apples-to-oranges comparison," and noting that it requires courts to undertake an additional analysis of whether defense counsel's billings were reasonable); *Ewald*, 2015 WL 1746375, at *15 (noting that while defense counsel's fees may sometimes be relevant to a determination of the reasonableness of plaintiff's counsel's fees, "frequently, the comparison is irrelevant.") (citations omitted).

This is a case in which the comparison is not particularly useful. For starters, HLC lost. With the benefit of hindsight, HLC might have billed more time or used additional staff. Had it done so, perhaps it might have enjoyed a different outcome. Moreover, even if one generally considers defense counsel's billables, as found in HLC's annual "10-K report" to the SEC, HLC expended a considerable amount in attorney's fees and costs on this case in *2018 alone*: approximately \$12.8 million.[33]  **\*855**  (*See* Stephens Letter [Doc. No. 5037], Ex. A (Lending Tree, Inc. Form 10-K) at 41).) In contrast, ResCap's request for nearly \$18.4 million in discounted attorneys' fees and nearly \$5.1 million in costs encompasses work that accrued over at least *four years*.

33    Specifically, HLC reported to the SEC,
      During 2018, 2017 and 2016, loss from discontinued operations of \$12.8 million, \$3.8 million and \$3.7 million, respectively, was attributable to the LendingTree Loans business. [Home Loan Center, Inc. operates as LendingTree Loans.] In 2018 loss from discontinued operations was primarily due to legal fees and litigation contingencies incurred in the Residential Funding Company, LLC v. Home Loan Center, Inc. matter. In 2017 and 2016, loss from discontinued operations was primarily due to litigation settlements and contingencies and legal fees associated with ongoing legal proceedings, primarily for the above matter.
      (*See* Stephens Letter [Doc. No. 5037], Ex. A (Lending Tree, Inc. Form 10-K) at 41).)

And while counsel on both sides possessed similar skills and reputation, the Court rejects the notion that between July and November 2018, Plaintiff's counsel and Defendant's counsel performed the same work, or that the work was "just as complicated for HLC as it was for ResCap." (*See* Def.'s Opp'n at 21.) Notably, their work was not the same due to the fact that ResCap bore the burden of proof. Among other things, ResCap created three complex damages models, presenting one at trial,

EXHIBIT 10 - MOHRMAN DECLARATION

while HLC offered no alternative model. In addition, ResCap presented the issue of the bankruptcy settlements' reasonableness at trial, for which it ultimately obtained judgment as a matter of law. In addition, at trial, it presented more than twice as many expert witnesses and three times as many live fact witnesses as HLC and prepared 11 former employees that HLC had intended to call at trial, but ultimately did not.

In addition, ResCap was still preparing for the next three cases in the trial queue, unlike HLC, which could focus solely on its own defense. Because ResCap was working on multiple cases, it organized attorneys by subject matter, and utilized more timekeepers than HLC. (Stephens Decl. ¶ 15.) As noted above, because ResCap presented more witnesses at trial, and bore the burden of proof, it utilized more timekeepers.

To the extent that national counsel utilized different staffing complements, with Plaintiff's counsel relying more heavily on partners as opposed to associates than defense counsel, that was an individual choice by counsel, over which each client had oversight. In a case as complicated as this, ResCap's decision to staff the case with more experienced legal counsel was reasonable. *See Owner-Operator Indep. Drivers Ass'n*, 2012 WL 6760098, at *12) (declining to reduce billable hours for time spent by senior attorneys conducting legal research, over defendant's objection that junior attorneys should have performed the work). There is no indication that ResCap staffed the case with more experienced attorneys and paralegals so as to unreasonably drive up its attorneys' fees. It staffed the case in the way it saw fit, just as HLC utilized a different staffing complement, as it saw fit.

HLC also compares the hours billed between local counsel. (Def.'s Opp'n at 22.) From July through November 2018, HLC contends that Felhaber billed 8,373 hours, compared to 226 hours billed by HLC's local counsel, Zelle, LLP ("Zelle"). (Hanson Decl. at 6.) It notes that Felhaber attorneys did not perform a single direct or cross-examination at trial, whereas counsel for Zelle cross examined a witness. (Def.'s Opp'n at 22.)

But as with national counsel, the way in which ResCap used local counsel was different than HLC's use of local counsel—a decision that was certainly within each client's prerogative. An important difference between local counsel is that Minnesota-based RFC had a longstanding relationship with Felhaber, which had represented it on a number of prior matters, including the *Terrace Mortgage* case. (Heeman Decl. ¶¶ 5–6.) In 2013, when RFC and ResCap began filing the first-wave cases here, they again hired Felhaber as lead local counsel. (*See id.* ¶ 12.) **\*856** Throughout this litigation, ResCap relied heavily on local counsel, with attorneys from Felhaber attending all of the monthly status conferences in the years leading up to July to November 2018. Felhaber attorneys also engaged in underwriting guideline and at-issue loan document analysis and actively participated in discovery and substantive motion practice. (Stephens Decl. ¶ 17 [Doc. No. 5011].) In contrast, in the years leading up to trial, HLC's local counsel did not play as visible a role. Again,

<span style="color:red">EXHIBIT 10 - MOHRMAN DECLARATION</span>

that was HLC's choice, just as it was ResCap's choice to give local counsel a larger role. Given the Felhaber attorneys' hands-on experience over the course of this years-long litigation, and its prior history representing the client, it is not surprising that ResCap utilized more of local counsel's time during the July to November 2018 period, as compared to HLC's use of Zelle's attorneys.

Nor does it matter that they performed different types of tasks. Regardless of whether Felhaber attorneys examined or cross examined witnesses at trial, Felhaber attorneys drafted pre-trial motions and letter submissions to the court, assisted with the preparation of direct and cross-examination outlines for both Plaintiff's and HLC's trial witnesses, conducted legal research and analysis, assisted with jury instructions and the special verdict form, and actively participated in the development of pre-trial, trial, and post-trial strategy. (*Id.*) That HLC chose to use local counsel differently was its independent choice, but its different use of local counsel does not serve as the standard by which to evaluate the reasonableness of Felhaber's billed hours. In light of these differences, the Felhaber attorneys billed more hours than the Zelle attorneys from July to November 2018. Any comparison between the two firms' billables is not particularly useful and does not warrant a reduction in fees.

HLC further challenges the hours billed by attorneys from Carpenter Lipps, who billed over 1,800 hours from July through November 2018. (Hanson Decl. at 13.) While HLC acknowledges that one Carpenter Lipps attorney served as a fact witness during trial, it points out that Carpenter Lipps attorneys did not conduct any direct or cross examinations at trial. (Def.'s Opp'n at 22.) The Court sees no reason to reduce an award to Carpenter Lipps. As RFC's former bankruptcy counsel, the firm's institutional knowledge was necessary to ResCap's indemnification case, and HLC itself notes that Mr. Lipps served as a fact witness. The reasonableness of the bankruptcy settlements was a central issue at trial, for which ResCap bore the burden of proof. And given the complexity of the bankruptcy process—described by Bankruptcy Judge Glenn as the most complicated case over which he had presided—the Court does not dispute the need for Carpenter Lipps' unique bankruptcy expertise and institutional knowledge. Comparing Carpenter Lipps' billables to those of defense counsel provides no insight on the reasonableness of Plaintiff's fee petition.

Because the Court finds that comparisons to the work of opposing counsel is not a useful gauge of reasonableness here, the Court declines to reduce Plaintiff's fee award on this basis.

### e. Duplicative Work and Excessive Interfirm and Intrafirm Communications

HLC also argues that in terms of sheer numbers of timekeepers, Plaintiff overstaffed the case and performed redundant work, noting that Quinn Emanuel used 107 timekeepers compared to 30 timekeepers from Williams & Connolly. (Def.'s Opp'n at 23) (citing Hanson Decl. at 7.) It also argues that ResCap's invoices reflect excessive interfirm and intrafirm communications. **\*857**

EXHIBIT 10 - MOHRMAN DECLARATION

(*Id.* at 24.) As one example, HLC points to entries for September 19, 2018, in which more than 30 timekeepers recorded over 50 entries for interfirm or intrafirm communications. (*Id.*) (citing Smallwood Decl., Ex. 1 at HLC-FP-092–93; *id.*, Ex. 2 at HLC-FP-170; *id.*, Ex. 3 at HLC-FP-338–42; *id.*, Ex. 4 at HLC-FP-595–97.) HLC estimates that Plaintiff's counsel billed a combined average of 276 hours a day (including weekends and holidays) between July 1 and November 8, 2018, and from the narrower period of October 8 to November 8, 2018, HLC estimates that Plaintiff's counsel billed 496 hours per day. (*Id.* at 18.)

Again, given the scope of this litigation and its complexity, it is not surprising that ResCap utilized the services of numerous attorneys and paralegals. The mere use of a large number of attorneys or paralegals does not in itself establish that hours are excessive. *See, e.g.*, *I-Sys., Inc.*, 2005 WL 1430323, at *12 (awarding fees to plaintiffs who had nine attorneys and six support staff work on an action). But by using three law firms, one would expect some overlap or redundancy in work, including some redundancy in communications among counsel. Sometimes, such communications and work in tandem are necessary, while at other times, the work could best be streamlined and performed by fewer attorneys. *See United States ex rel. Thompson v. Walgreen Co.*, 621 F. Supp. 2d 710, 716 (D. Minn. 2009). Since filing its initial petition, ResCap has voluntarily reduced its fee request by eliminating billing entries for 18 Quinn Emanuel and Carpenter Lipps timekeepers during this period, for a total reduction of $18,062.50 in fees. (Pl.'s Reply at 16 n.8; Supp'l Horner Decl. ¶ 3.)

While the Court is appreciative of ResCap's voluntary reduction, having reviewed ResCap's unredacted invoices, the Court finds that a further reduction is warranted to account for duplication, redundancy, and interfirm and intrafirm communications. *See BP Grp., Inc. v. Capital Wings Airlines, Inc.*, No. 09-cv-2040 (JRT/JSM), 2011 WL 4396938, at *2 (D. Minn. Sept. 21, 2011) (reducing fee request to account for numerous interoffice conferences). Accordingly, the Court deducts 2% ($367,402.71) of the $18,370,135.55 fee request to account for duplicative work and intrafirm/interfirm communications. Consequently, the revised fee total is $18,002,732.84.

### f. Fees for Preparing & Litigating the Fee Petition

HLC argues that ResCap is not entitled to any attorneys' fees stemming from the work performed, and costs incurred, in preparing the instant petition. (Def.'s Opp'n at 37–39.) Relying on authority from other jurisdictions, HLC argues that absent contractual language that expressly authorizes the recovery of attorney's fees for the preparation of a fee petition, Plaintiff may not recover fees for such work. (*Id.* at 38) (citing *IG Second Generation Partners, L.P. v. Kaygreen Realty Co.*, 114 A.D.3d 641, 643, 980 N.Y.S.2d 479 (N.Y. App. Div. 2014); *Houden v. Todd*, 375 Mont. 1, 324 P.3d 1157, 1160, 1165 (2014)). Although HLC acknowledges that courts have awarded "fees on fees" in statutory attorney's fee cases, it argues that the "public policy concerns animating those

EXHIBIT 10 - MOHRMAN DECLARATION

cases ... are not present here." (*Id.*) (citing *Jones v. MacMillan Bloedel Containers, Inc.*, 685 F.2d 236, 239 (8th Cir. 1982)).

The Court disagrees. As HLC notes, under Minnesota law, "attorney fees are not recoverable in litigation unless there is a specific contract permitting ... such recovery." *Dunn v. Nat'l Beverage Corp.*, 745 N.W.2d 549, 554 (Minn. 2008)). Section A212 of the Client Guide expressly provides for all attorneys' fees and costs incurred in enforcing the contract, without limitation. (*See* Client Guide § A212 [Doc. **\*858** No. 3244-2] at 68 ("The Client also shall indemnify GMAC-RFC and hold it harmless against all court costs, attorney's fees and any other costs, fees and expenses incurred by GMAC-RFC in enforcing the Client Contract.").) Pursuant to general contractual fee-shifting provisions, Minnesota courts have permitted the award of attorneys' fees for work expended in preparing the fee petition. *See Boundary Waters Bank v. McGaughey*, No. A15-1950, 2016 WL 1397305, at *1, 5 (Minn. Ct. App. Apr. 11, 2016) (finding it within the trial court's discretion to award attorney fees related to submitting the fee petition "as these were incurred in pursuing [a party's] rights under a [fee-shifting contract]" which provided for "reasonable attorney[ ] fees"). The Client Guide was a freely negotiated contract between two sophisticated parties and it contains no fee-shifting exceptions for fee petition work. HLC fully anticipated that ResCap would move for attorney's fees. The Court has reviewed Plaintiff's invoices for this work and finds them to be reasonable. Plaintiff is entitled to fees for its work related to the fee petition. The Court will not reduce the award for this work.

### g. Lodestar Summary

The Court briefly considers the *Milner* factors that it has not yet expressly addressed: the time and labor required, the nature and difficulty of the responsibility assumed, and the experience, reputation, and ability of counsel. [34] *See* 748 N.W.2d at 621. First, the time and labor required for ResCap to successfully advance this case was extraordinary. While HLC portrays ResCap's attorneys' fees as excessive, the Court primarily disagrees, subject to the limited exceptions discussed above. This was a four-years-long lawsuit that involved intensive work, including reunderwriting, sampling, the creation of damages models, and expert witness preparation. The consideration of time and labor supports the general reasonableness of Plaintiff's fee petition.

[34]   The Court has already addressed the amount involved and the results obtained, and the fees customarily charged for similar legal services. The Court will consider the fee arrangement between counsel and the client in its separate analysis of the contingency payment.

So too does consideration of the nature and difficulty of the responsibility assumed. This was an extremely complicated, aggressively litigated case. As noted throughout, the presiding Bankruptcy Judge found it to be the most complicated case of his career, and the undersigned judge likewise

EXHIBIT 10 - MOHRMAN DECLARATION

finds it to be among the most challenging, complex cases in her legal career. This case required the top-notch legal counsel that ResCap retained.

Finally, the experience, reputation, and ability of Plaintiff's counsel was outstanding. The Court has had frequent opportunity to observe counsel, during the years leading up to trial, during the 16-day trial itself, and in post-trial motions. The excellent reputation of Plaintiff's counsel is well-deserved. At all times, they have been unquestionably candid, prepared, well-organized, effective, thorough, and respectful. Consideration of this factor supports a finding of reasonableness as well.

In sum, the Court finds that Quinn Emanuel's discounted hourly rates, along with the regular rates of Felhaber, Carpenter Lipps, and Spencer Fayne, are appropriate to determine the lodestar. Plaintiff's invoices reflect the expenditure of billable hours resulting in its lodestar fee calculation of $18,370,135.55. The Court finds that overall, the total hours were generally properly expended, subject to the reduction for duplicative work and interfirm/intrafirm communications, discussed earlier. With the reduction, this results in a lodestar **\*859** of $18,002,732.84, which the Court finds reasonable.

### 4. Adjustments

The Court now considers any adjudgments to the loadstar, including the request for the [redacted] contingency payment of $[redacted] to Quinn Emanuel. *See Krause,* 2018 WL 2187043, at *3 (when determining reasonableness of a hybrid billing procedure, courts first examine the hourly billings to determine the loadstar, then consider any contingency fees in the context of enhancements to the lodestar); *see also Hensley,* 461 U.S. at 429–30 n.3, 103 S.Ct. 1933 (considering whether the fee is fixed or contingent when determining whether to adjust the loadstar).

There is a strong presumption that the lodestar is a reasonable fee, and courts may increase the amount only in "rare and exceptional cases." *Pennsylvania v. Del. Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). For instance, if the lodestar "does not adequately take into account a factor that may properly be considered in determining a reasonable fee," enhancement may be warranted. *Perdue v. Kenny A. ex rel. Winn,* 559 U.S. 542, 553–54, 130 S.Ct. 1662, 176 L.Ed.2d 494 (2010). Addressing whether superior attorney performance is not adequately factored into a court's determination of the lodestar, the Supreme Court has noted that it may be appropriate to enhance a fee where: (1) the method used in determining the hourly rate in the lodestar calculation does not adequately measure the attorney's true market value; (2) the attorney's performance includes an extraordinary outlay of expenses in

<div align="center" style="color:red">EXHIBIT 10 - MOHRMAN DECLARATION</div>

exceptionally protracted litigation; or (3) the attorney's performance involves exceptional delay in the payment of fees. *Id.* at 555–56, 130 S.Ct. 1662.

As the Supreme Court has noted, many of the factors noted in *Hensley* are subsumed in the lodestar determination, such that the "novelty [and] complexity of the issues," "the special skill and experience of counsel," the "quality of the representation," and the "results obtained" from the litigation are reflected in the lodestar amount, and "cannot serve as independent bases for increasing the basic fee award." *Del. Valley*, 478 U.S. at 565, 106 S.Ct. 3088 (citing *Blum*, 465 U.S. at 898–900, 104 S.Ct. 1541).

The Court has considered these factors in its calculation of the lodestar and, as set forth above, generally agrees that Plaintiff is entitled to most of its requested attorney's fees, which, for Quinn Emanuel's work, involved a [redacted] discount in hourly rates. Quinn Emanuel's hourly discounted rates are at the upper end of the local market value for such work, as discussed earlier. Given Quinn Emanuel's experience in bankruptcy and RMBS litigation, the Court finds that compensation at this upper end of the local market is fully warranted. However, the Court does not find this to be a situation in which the lodestar calculation fails to adequately measure Quinn Emanuel's true market value. And while this case involved protracted litigation and significant expenses, Quinn Emanuel's billing arrangement was not on a pure contingency basis, such that it involved an exceptional outlay of expenses or delay in payment. *See Ewald*, 2015 WL 1746375, at *13 (declining to enhance the lodestar in protracted litigation that involved a period of delay in payment, but where Plaintiff was able to pay a significant portion of her fees and costs along the way).

While the Court recognizes the tremendous talent and efforts of Quinn Emanuel's counsel, it respectfully declines to include the [redacted] contingency payment in the award of attorney's fees. For all of the reasons discussed earlier, the Court finds **\*860** that the revised lodestar, $18,002,732.84, constitutes reasonable attorneys' fees. This was a contentious, long lawsuit, and this award reflects the complexity, and time-consuming nature of this case. No further enhancements are warranted.

Nor are further reductions warranted. True, Plaintiff's request for fees and costs is high. But so too was the amount at stake in this litigation and the subsequent cases in the trial queue. In addition, throughout the particularly contested period of July to November 2018, ResCap's counsel expended considerable time responding to HLC's requests and arguments, some of which were variations of previously rejected arguments. *See I-Sys., Inc.*, 2005 WL 1430323, at *12 (noting that "the extent of the work expended by plaintiffs' attorneys was not conducted in a vacuum. Rather, much of plaintiffs' attorneys' effort was spent responding to defendants' three sets of attorneys, whose participation and output in this case was prodigious."). HLC presented a vigorous defense,

<span style="color:red">EXHIBIT 10 - MOHRMAN DECLARATION</span>

which it was fully entitled to do. However, it did so with the knowledge that the Client Guide contemplated an award of attorneys' fees.

## C. Whether Costs Are Reasonable

HLC also objects to Plaintiff's request for the reimbursement of its costs, which was initially for $5.15 million. (Def.'s Opp'n at 33–34.) ResCap's revised cost request is for $5,078,519.47, and includes expenditures for experts and support firms, document vendors, and trial witnesses and vendors. (*See* First Supp'l Horner Decl., Ex. 59 (Rev'd Fee & Cost Summ.).)

Although ResCap asserts that courts presumptively award all costs, (Pl.'s Mem. at 18 n.7), it cites authority discussing fees and costs set forth in 28 U.S.C. § 1920, *see* Concord Boat Corp. v. Brunswick Corp., 309 F.3d 494, 498 (8th Cir. 2002); *Thompson v. Wal-Mart Stores, Inc.*, 472 F.3d 515, 517 (8th Cir. 2006), as opposed to costs awarded pursuant to a contract. The Court will consider the reasonableness of Plaintiff's costs. *See* I-Sys., Inc., 2005 WL 1430323, at *14–15 (considering reasonableness of costs despite absence of "reasonable" qualifier in contractual fee-shifting provision for "any and all legal fees and costs.").

HLC argues that Plaintiff's costs are excessive, and again notes that ResCap incurred a significant portion of costs—about $2.72 million—from July through November 2018. (Def.'s Opp'n at 34.) Arguing that $5 million in total costs is excessive for "a case involving just $28.7 million in damages," HLC again fails to acknowledge even the possibility that Plaintiff's recovery might include prejudgment interest. As noted many times, Plaintiff's recovery is nearly $42.8 million. In any event, the Court is unaware of any requirement in Minnesota that costs be proportional to a Plaintiff's recovery.

As with attorneys' fees, HLC compares its costs with ResCap's costs in support of its argument that ResCap's costs were unreasonable. (*Id.* at 35.) HLC states that Plaintiff spent about $1.48 million on trial witnesses, vendors for office space, graphics, and jury consulting, while HLC spent about $159,000 on similar services. (*Id.*) With respect to trial graphics and jury consulting in particular, HLC asserts that ResCap spent nearly $1.2 million, while HLC spent only about $157,000 on similar services. (*Id.*) HLC's expert opines that ResCap's expenditure on such services is "extraordinary" and is "greater than many local firms would charge in attorney time over a similar time frame to try a single-plaintiff, single-defendant contractual case." (*Id.*) (citing Hanson Decl. at 10.) HLC also points to ResCap's expenditure of over $47,000 on four fact witnesses, whereas HLC spent $2,070 on two fact witnesses. (*Id.*) (citing Hanson Decl. at 11.) Similarly, it notes that ResCap spent $1.23 **\*861** million on expert witnesses, whereas HLC spent $635,000. (*Id.* at 36) (citing Hanson Decl. at 11.)

EXHIBIT 10 - MOHRMAN DECLARATION

As with the differences in attorneys' fees, the Court does not find the comparisons between the firms' expenditures particularly enlightening. For the reasons noted earlier, while the Court respects Justice Hanson's background and experience, HLC did not sufficiently prepare him.[35] Many reasons account for the differences between ResCap's costs and HLC's costs. Again, Plaintiff had the burden of proof at trial and HLC did not. Given this fundamental difference, the fact that ResCap utilized more witnesses than HLC is not surprising. And even though the Court eliminated many of HLC's expert witnesses on Plaintiff's *Daubert* motions, Plaintiff was nevertheless required to establish the prima facie elements of its indemnification case, which required expert witnesses, to say nothing of presenting the highly complex factual background of the underlying bankruptcy proceedings and settlements to the jury. Moreover because the question of the reasonableness of the bankruptcy settlements remained for trial, it is not surprising that ResCap expended over $361,000 in preparing its bankruptcy reasonableness expert, Donald Hawthorne, for this seminal issue. Establishing the reasonableness of the underlying settlements, for which the Court granted Plaintiff judgment as a matter of law, was critical to the success of Plaintiff's indemnification claim.

[35]   Even HLC admits that "[i]n light of the compressed timetable for Plaintiff's motion, Mr. Hanson was unable to review all of the expert reports and testimony in this matter and thus is not opining on whether Plaintiff's expert expenses from July through November 2018 were unreasonable." (Def.'s Opp'n at 36 n.17.) As discussed earlier, however, HLC has *always* been on notice of the very real prospect of a motion for attorneys' fees and costs, given the Client Guide's express provisions. Even setting aside its more general notice, HLC could have begun the work of providing an expert with the necessary, intensive background information weeks, if not months, prior to late January 2019—certainly shortly after the jury rendered its verdict on November 8, 2018. It did not do so. The Court rejects any notion that a compressed briefing timetable excuses HLC's inadequate preparation of its expert.

In the context of Plaintiff's request for costs, HLC again portrays this case as a straightforward, two-party breach of contract suit. (*See* Def.'s Opp'n at 35) (referring to this as a "single-plaintiff, single defendant contractual case" in challenging Plaintiff's costs for trial witnesses and vendors). It was anything but that. As Plaintiff notes, this was a case involving tens of millions of pages of documents, over 150 fact depositions, 25 testifying experts, hundreds of individual loans, and a 16-day jury trial. (Pl.'s Reply at 16–17) (citing First Supp'l Horner Decl., Ex. 59)). And, again, the case originated in $9 billion bankruptcy settlements. The dollar amounts at stake and the complicated underlying factual and legal issues rendered this case one of a kind. It could not be further from a typical, "single-plaintiff, single-defendant" breach of contract case in Minnesota, as reflected in the request for costs.

Also, HLC minimizes the impact that a verdict in the HLC trial would have on Plaintiff's remaining cases. In effect, the HLC trial served as a bellwether. Because the verdict here would significantly impact ResCap's settlement negotiations in the other remaining cases, ResCap

EXHIBIT 10 - MOHRMAN DECLARATION

invested considerable resources in preparing for trial, which included the use of jury consultants. One can reasonably infer that the HLC verdict did, in fact, impact the remaining cases, as all of them settled within two months of the HLC verdict. Given these circumstances, the Court does not find ResCap's expenditures, including its **\*862** expenditures on jury consultants, unreasonable. In hindsight, had HLC invested more resources in jury consultants or experts, the outcome of this trial might have been different. HLC's costs do not set the bar for reasonableness and any comparison is not helpful to the Court's analysis here.

Moreover, Plaintiff elected not to seek reimbursement for bankruptcy costs, any portion of the $2.4 million in costs that Quinn Emanuel incurred before September 2018, any portion of expert fees of AlixPartners/Dudney before July 2018, and costs from several document vendors. (Horner Decl. ¶¶ 23, 60, 63.) In addition, after HLC objected to particular costs, ResCap modified its request, excluding the pre-October 2018 fees of expert Louis Dudney, which included work on other cases, and the fees of excluded expert Richard Solum, totaling $78,384.30. (Pl.'s Reply at 18 n.9.) This demonstrates ResCap's good faith efforts to present a reasonable request for its costs.

In sum, for the reasons noted above, the Court declines to reduce Plaintiff's award of costs based on comparisons to HLC's costs. Also, for the reasons discussed earlier with respect to Plaintiff's level of success, it further declines to reduce costs by an additional 25% to 50% to account for ResCap's "limited success." (*See* Def.'s Opp'n at 37) (citing Hanson Decl. at 16.) Rather, the Court finds that Plaintiff's revised cost request of $5,078,519.47 is reasonable and it is entitled to an award of costs in this amount.

### D. Postverdict Prejudgment Interest

In the Court's March 18, 2019 Order on prejudgment interest, it awarded ResCap postverdict prejudgment interest on the total award of damages. (Mar. 18, 2018 Order at 21 [Doc. No. 5039].) So that the Court may enter final judgment in this matter, Plaintiff shall promptly file its calculation of the appropriate award of postverdict prejudgment interest on the total award of damages, inclusive of preverdict prejudgment interest on the jury's award, but not on the award of attorneys' fees. (*See id.*) The Court directs Plaintiff to provide a calculation over a range of three to four days, to give the Court time to review the submission and direct entry of judgment with the correct calculation. *See, e.g.*, *Kelley v. Boosalis*, 18-cv-868 (SRN/TNL), Plaintiff's Am. Calc. of Prej. Interest [Doc. No. 122] at 1; *id.*, Order Directing Entry of J. [Doc. No. 124] at 6.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Plaintiff's Motion for Attorneys' Fees and Costs [Doc. No. 4852] is **GRANTED in part** and **DENIED in part**;

EXHIBIT 10 - MOHRMAN DECLARATION

2. Plaintiff is entitled to attorneys' fees and costs from Defendant Home Loan Center in the amount of $23,081,252.31 ($18,002,732.84 in attorneys' fees + $5,078,519.47 in costs);

3. Plaintiff shall promptly file its calculation of the appropriate award of postverdict prejudgment interest on the total award of damages; and

4. This Order is temporarily filed under seal. Within seven (7) days of the date of this Order, the parties are **ORDERED** to **show cause** as to why the Order should remain under seal, and if so, which portions of the Order should remain sealed and for how long. To that end, the parties must file (under seal) a joint brief, no longer than five (5) pages, and/or a proposed Redacted Order, if they would like portions to remain under seal.

**All Citations**

399 F.Supp.3d 827

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT 10 - MOHRMAN DECLARATION